# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| NICHOLAS GREEN, JAMES "SCOTT" DOUGLAS, and JOSEPH GOAD, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>VAIL RESORTS, INC.; ALTERRA MOUNTAIN COMPANY; BOYNE USA, INC. d/b/a BOYNE RESORTS; POWDR CORP.; RRC ASSOCIATES, INC.; and NATIONAL SKI AREAS ASSOCIATION,<br><br>*Defendants.* | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ........................................................................................... 3

II.   JURISDICTION AND VENUE ................................................................................... 7

III.  PARTIES ....................................................................................................................... 9

A.    Plaintiffs ...................................................................................................................... 9

B.    Defendants ................................................................................................................. 10

1.    Vail Resorts.......................................................................................................... 10

2.    Alterra Mountain Company ................................................................................. 10

3.    Boyne Resorts ...................................................................................................... 11

4.    Powdr Corp. ......................................................................................................... 11

5.    RRC Associates ................................................................................................... 12

6.    National Ski Areas Association ........................................................................... 12

C.    Co-conspirators ......................................................................................................... 13

IV.   FACTUAL ALLEGATIONS ...................................................................................... 13

A.    Destination Ski Resorts and Destination Ski Packages. ........................................... 13

B.    Resort Defendants, Led by Vail and Alterra, Gain Control of the Destination Ski Resort Market Through Anticompetitive Acquisitions and Season Pass Alliances............................ 15

1.    Vail goes public and starts acquiring Destination Ski Resorts. ........................... 15

2.    Vail creates the Epic Pass. .................................................................................. 16

3.    Vail acquires more Destination Ski Resorts and Regional Ski Areas that use the Epic Pass. ............................................................................................................................ 16

4.    Alterra is formed and acquires numerous Destination Ski Resorts. .................... 17

5.    Alterra releases the Ikon Pass and partners with Boyne and Powdr.................... 17

6.    Resort Defendants consolidate control in the Destination Ski Resorts industry. ......... 18

7.    Resort Defendants have market power over domestic Destination Ski Resorts industry. 21

C.    Grave Threats to Resort Defendants' Financial Stability Emerge................................... 23

D.    Defendants Unlawfully Exchange Information and Fix Prices for Destination Ski Packages............................................................................................................................ 27

E.    The Destination Ski Resort Market Possesses Characteristics That Make It Susceptible to the Effective Collusion That Has Occurred. .................................................................. 59

V.    PLAINTIFFS' CLAIMS ARE TIMELY........................................................................ 72

VI.   ANTITRUST INJURY AND CLASS ALLEGATIONS ............................................... 74

## I.    NATURE OF THE ACTION

1.    Plaintiffs Nicholas Green, James "Scott" Douglas, and Joseph Goad, on behalf of themselves and all others similarly situated ("Plaintiffs"), bring this antitrust action against Defendants Vail Resorts, Inc. ("Vail"), Alterra Mountain Company ("Alterra"), Boyne USA Inc. d/b/a Boyne Resorts ("Boyne"), Powdr Corp. ("POWDR" or "Powdr," and collectively with Vail, Alterra and Boyne, "Resort Defendants"), RRC Associates, Inc. ("RRC"), and National Ski Areas Association ("NSAA," and collectively with Resort Defendants and RRC, "Defendants"). As detailed below, since at least January 2020, Defendants have unlawfully exchanged confidential and proprietary information and otherwise colluded to artificially inflate prices for Destination Ski Packages in the United States. The scheme was enabled by a series of anticompetitive acquisitions that substantially reduced competition in the Destination Ski Resort market.

2.    Destination Ski Resorts are located on extra-large mountains with high-speed, high-capacity ski lift access. These resorts provide a distinct cluster of goods of services centered upon a "village" infrastructure capable of supporting multi-day stays, specialized amenities, and on-mountain accommodations. Of the approximately 485 active ski areas in the United States, only 32 qualify as Destination Ski Resorts. Yet that handful of Destination Ski Resorts accounts for the majority of ski traffic. Destination Ski Packages consist of the bundle of products and services Destination Ski Resorts sell to consumers in connection with their stays, including multi-mountain season passes, daily lift tickets, equipment rentals, lessons, and ancillary goods and services.

3.       Resort Defendants—the largest Destination Ski Resort owners and operators in the United States who are otherwise direct horizontal competitors—have come to control the vast majority of Destination Ski Resorts comprising the domestic Destination Ski Resort market. This resulted from neither luck nor happenstance, but from a sustained strategy of consolidation led by Defendants Vail and Alterra. They own or control access to all but two of the 32 Destination Ski Resorts, as well as numerous other smaller ski resorts. Many of these acquisitions occurred under the Hart-Scott Rodino thresholds that require automatic review by the United States Department of Justice or the Federal Trade Commission. Such "stealth acquisitions" allowed Defendants to substantially increase their market power to the detriment of consumers like Plaintiffs here.

4.       These acquisitions also set the stage for Defendants, faced with the twin threats of increasing climate change and an emerging global pandemic, to work together in earnest to charge supracompetitive prices for Destination Ski Packages.

5.       Beginning no later than early 2020, Resort Defendants, enabled and facilitated by NSAA and RRC, knowingly and intentionally shared confidential information with RRC, including contemporaneous revenue, cost, capacity, and supply data for Destination Ski Package products and services like multi-mountain season passes, daily lift tickets, equipment rentals, and lessons. RRC used this non-public, resort-level information to prepare and circulate comprehensive reports to NSAA members like Resort Defendants that informed the business decisions and strategies they implemented for the upcoming ski season. RRC also added this information to the vast database containing the troves of previously collected resort-specific business data that it maintained under NSAA authority.

4

6. The information exchange did not stop there. Through private consulting arrangements between RRC and individual Resort Defendants including Vail and Alterra, RRC used the non-public, resort-specific information housed in its database—and the unparalleled knowledge and insight gleaned from it—to recommend optimal pricing and other business decisions that these Resort Defendants followed. Through their consulting relationships with RRC, these Resort Defendants were able to use the non-public, competitively sensitive business information of their competitors to set prices for Destination Ski Packages at artificially high levels and avoid meaningfully competing with each other.

7. Defendants also have engaged in other coordinated actions, including those described immediately below, that supplement and reinforce the purpose and effect of the unlawful information exchange.

8. Alterra, Boyne, and Powdr—who all partner to offer Alterra's multi-mountain season-long Ikon Pass—knowingly and intentionally have used the same e-commerce platform and pricing module provided by Alterra-co-owned technology firm Aspenware. To use the Aspenware Commerce platform, these Resort Defendants had to adopt a uniform set of data reporting fields. This has helped make Defendants' information exchange (in which Vail also participates) even more efficient and effective. In addition, by using the platform's module for dynamic pricing (which continuously adjusts each firm's pricing in real time based on demand, inventory, and competitor behavior), these Resort Defendants have deployed the same pricing strategy for Destination Ski Packages. While Vail does not use Aspenware, it too has deployed a dynamic pricing strategy for Destination Ski Packages through an in-house platform.

9. Defendants also have discussed Destination Ski Package pricing, revenue, costs, capacity, consolidation, and other sensitive business subjects with each other at industry gatherings immediately before and during the Class Period. During annual NSAA National Conventions between 2019 and 2026, Resort Defendants' senior leaders discussed "strategies" and "insights" on subjects like "consolidation," "capacity management," "pricing," "the rising price of day tickets," and "season pass strategy." In the course of one particular discussion about "each company's strategy [for] season passes," an executive of one Resort Defendant advised his counterparts "to not oversell season passes because it limits how you can control capacity," while his counterpart from another Resort Defendant stated that the company would not change its established season pass "strategy" but offered that "it does limit day ticket sales on certain days at certain properties to address" issues like "capacity." RRC employees also presented on many of the same topics, covering areas like ski resorts' "strong revenue," "percent of ticket/pass revenue by ticket category," "cost pressures," and "projected capital expenditures by category and amount." Observing these kinds of competitively sensitive discussions among purported rivals while covering these events, one trade publication noted "the U.S. ski industry's collaborative culture, where competitors are also resources for one another."

10. These additional coordinated acts, together with the unlawful information exchange, evidence an overarching conspiracy by Defendants to fix, raise, maintain, or stabilize the prices for Destination Ski Packages that is *per se* illegal.

11. Defendants' scheme has worked as intended. Publicly available data demonstrates that the prices of Resort Defendants' Destination Ski Packages, including annual multi-mountain season passes and daily lift tickets, have increased substantially, in parallel fashion, and without

proper regard for ordinary market forces during the Class Period. The starting price for multi-mountain passes used at Resort Defendants' Destination Ski Resorts has risen significantly and in parallel. Alterra's Ikon and Ikon Base Passes, also used at Boyne and Powdr resorts, increased over 45%, and Vail's Epic and Epic Local Passes increased by nearly 40% (after excluding its pricing reset from one pandemic-era season). Customers similarly have faced parallel exorbitant increases for peak daily lift ticket prices during the Class Period. Each Resort Defendant increased peak day-of prices at its flagship Destination Ski Resorts by over 55%, and clear patterns of parallel daily ticket pricing are observed within Resort Defendants' other tiers of competing Destination Ski Resorts.

12.     Defendants' anticompetitive conduct has caused Plaintiffs and the other Class members to pay artificially inflated prices for Destination Ski Packages in the United States from Resort Defendants and their co-conspirators and otherwise injured them in ways that the antitrust laws are designed to prevent.

13.     Plaintiffs bring this suit on behalf of themselves and the other members of the Class against Defendants to recover all monetary and injunctive relief available under federal antitrust law.

## II.    JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

15.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A) and Colorado Rev.

Stat. § 13-1-124. Defendants NSAA, RRC, Vail and Alterra all reside in this District and used their headquarters to implement and coordinate the restraints of trade described herein. In addition, Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of their anticompetitive acts in the United States, including in this District.

16.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the sale of goods and services comprising Destination Ski Packages.

17.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce, including through the sale of goods and services comprising Destination Ski Packages, consulting services related to the sale of goods and services comprising Destination Ski Packages, or advocacy, networking, and educational services related to the sale of goods and services comprising Destination Ski Packages.

18.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

19.     Destination Ski Packages are sold in interstate commerce. Defendants' anticompetitive conduct was intended to, and did, cause injury to Plaintiffs and Class Members, who purchased season passes, lift tickets, equipment rentals, lessons, and other products and

8

services comprising Destination Ski Packages from Resort Defendants, any of their current or former divisions, subsidiaries, predecessors, agents, or affiliates, or any of their co-conspirators. Defendants expressly aimed their anticompetitive actions at the U.S. marketplace, and this misconduct has resulted in an adverse effect on competition and purchasers of Destination Ski Packages nationwide and across the states identified in this Complaint.

### III.  PARTIES

#### A.  Plaintiffs

20.     Plaintiff Nicholas Green is a resident of Minnesota. During the Class Period, he purchased four Destination Ski Packages from Big Sky Resort, owned by Boyne. Mr. Green paid supracompetitive prices for Destination Ski Packages and suffered antitrust injury and damages as a material, direct, and proximate cause of Defendants' anticompetitive conduct.

21.     Plaintiff James "Scott" Douglas is a resident of Colorado. During the Class Period, he purchased Destination Ski Packages from Copper Mountain, owned by Powdr. Mr. Douglas paid supracompetitive prices for Destination Ski Packages and suffered antitrust injury and damages as a material, direct, and proximate cause of Defendants' anticompetitive conduct.

22.     Plaintiff Joseph Goad is a resident of Colorado. During the Class Period, he purchased Destination Ski Packages from Vail and Alterra, including the multi-mountain Epic and Ikon passes. Mr. Goad paid supracompetitive prices for his purchases of Destination Ski Packages and suffered antitrust injury and damages as a material, direct, and proximate cause of Defendants' conspiracy and overt acts in furtherance thereof.

### B. Defendants

#### 1. *Vail Resorts*

23.     Defendant Vail Resorts, Inc. ("Vail") is a Delaware corporation with its principal place of business at 390 Interlocken Crescent, Broomfield, Colorado 80021. Vail is a publicly traded company and is the largest mountain resort operator in the world.

24.     Vail owns and operates "the most renowned destination resorts in the world as well as regional and local ski areas outside major cities, and connects them all through one unrivaled network." Its Destination Ski Resorts in the United States consist of Vail Mountain, Beaver Creek, Breckenridge, Park City, Keystone, Heavenly, Northstar, Mount Snow, Stowe, Okemo, and Stevens Pass. At all times relevant to this Complaint, Vail with and through its subsidiaries engaged in the business of providing Destination Ski Packages to consumers traveling in interstate commerce.

25.     Vail is the architect of the Epic Pass, the first of its kind multi-mountain season pass that helped shift consumer behavior from purchasing daily "window" lift tickets to up-front, discounted season-long commitments.

#### 2. *Alterra Mountain Company*

26.     Defendant Alterra Mountain Company ("Alterra") is a Delaware limited liability company with its principal place of business located at 3501 Wazee Street, Suite 400, Denver, Colorado 80216. Alterra was formed in 2018 as a joint venture between KSL Capital Partners and Henry Crown and Company (the ultimate parent company of Aspen Skiing Company).

27.     Alterra owns and operates 16 year-round mountain destinations in the United States. Its Destination Ski Resorts in the United States consist of Palisades Tahoe, Steamboat,

Deer Valley, Winter Park, Mammoth, Sugarbush, Stratton, Schweitzer, and Crystal Mountain (Washington).

28.    At all times relevant to this Complaint, Defendant Alterra with and through its subsidiaries engaged in the business of providing Destination Ski Packages to consumers traveling in interstate commerce.

29.    Alterra manages and sells the Ikon Pass, which serves as the direct and only functional substitute for Vail's Epic Pass. The Ikon Pass network includes the Destination Ski Resorts owned or operated by Alterra, Boyne, and Powdr.

### 3.    *Boyne Resorts*

30.    Defendant Boyne USA, Inc. d/b/a Boyne Resorts ("Boyne") is a Michigan corporation with its principal place of business located at 3951 Charlevoix Avenue, Petoskey, Michigan 49770.

31.    Boyne is a mountain resort enterprise that owns, operates, and manages a portfolio of ski and golf resorts across North America. Its Destination Ski Resorts in the United States consist of Big Sky, Sunday River, and Sugarloaf, all of which accept the Ikon Pass.

32.    At all times relevant to this Complaint, Defendant Boyne with and through its subsidiaries engaged in the business of providing Destination Ski Packages to consumers traveling in interstate commerce.

### 4.    *Powdr Corp.*

33.    Defendant Powdr Corp. ("POWDR" or "Powdr") is a Delaware corporation with its principal place of business located at 1526 Ute Blvd, Suite 101, Park City, Utah 84098.

11

34.    Powdr is a privately-held adventure lifestyle company that owns and operates numerous mountain resorts. Its Destination Ski Resorts in the United States consist of Copper Mountain, Snowbird, Mt. Bachelor, and Killington (until September 2024), all of which accept the Ikon Pass.

35.    At all times relevant to this Complaint, Defendant Powdr with and through its subsidiaries engaged in the business of providing Destination Ski Packages to consumers traveling in interstate commerce.

### 5.  RRC Associates

36.    Defendant RRC Associates, Inc. ("RRC") is a Colorado limited liability company with its principal place of business located at 1401 Walnut Street, Suite 220, Boulder, Colorado 80302. RRC is a specialized market research and data analytics firm focusing on the travel, recreation, and hospitality industries.

37.    RRC occupies a unique position as the primary data aggregator for the ski industry. In cooperation with NSAA and its member resorts, RRC prepares annual reports addressing statistics and trends critical to the business of Destination Ski Resorts. It also provides exclusive access to granular, resort-level business data through consulting agreements with individual Destination Ski Resorts, including the two largest Resort Defendants.

### 6.  National Ski Areas Association

38.    Defendant National Ski Areas Association ("NSAA") is a non-profit trade association incorporated in Colorado and with its principal place of business located at 133 S. Van Gordon Street, Suite 300, Lakewood, Colorado 80228.

39.     NSAA is the industry trade association for ski resort owners and operators. It represents hundreds of resort and supplier members. To "[s]upport members in their pursuit to operate thriving and sustainable businesses and deliver exceptional experiences," NSAA releases industry statistics, reports, and publications, runs annual conferences and tradeshows, and lobbies state and federal governmental bodies.

### C. Co-conspirators

40.     Co-conspirators are various persons and entities, including other destination mountain resorts, known and unknown to Plaintiffs and not currently named as defendants in this action, who have participated as co-conspirators with Defendants in the offenses alleged and have performed acts and made statements in furtherance of the alleged anticompetitive conduct.

41.     Defendants are jointly and severally liable for the acts of the co-conspirators whether or not named as defendants in this Complaint.

42.     Each Defendant and co-conspirator acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

## IV.  FACTUAL ALLEGATIONS

### A. Destination Ski Resorts and Destination Ski Packages.

43.     Ski areas in North America can generally be divided into two broad categories: the larger Destination Ski Resorts and smaller Regional Ski Areas.

44.     A Destination Ski Resort is typically located on what the NSAA defines as an "Extra-Large" ski mountain. This type of mountain measures over 20 million vertical transportation feet per hour (VTF/h) with high-speed, high-capacity ski lift access to alpine

terrain along with vertical drops exceeding 2,000 feet. The resorts offer a distinct cluster of goods of services, including a "village" infrastructure capable of supporting multi-day stays and specialized amenities including ski rentals, ski lessons, and on-mountain food, beverage, and lodging. For these reasons, these resorts are popular nationwide and visited by millions of skiers each year.

45.    Regional Ski Areas, in contrast, are typically located on smaller mountains with lower VFT/h, have fewer yearly visitors and overnight visitors, possess inferior infrastructures, and offer fewer amenities.

46.    The U.S. ski industry is largely insular. Roughly 97% of skiers at U.S. mountains are U.S. citizens, and only a small percentage of American skiers travel abroad for skiing.

47.    At Destination Ski Resorts, out-of-state guests account for most of the skier visits. Around 70% of the visits are overnight trips, with 95% staying more than one night. For nine of the top 10 Destination Ski Resorts in the Rocky Mountain Region, for example, 64% of overnight visitors fly in for their stays.

48.    Downhill skiing,[1] particularly at Destination Ski Resorts, is a capital-intensive activity. It starts with gathering the appropriate gear: warm underlayers and socks, jacket, pants, gloves, helmet, eyewear. You need the equipment: helmets, boots, skis, poles, and boots or a snowboard and boots. You may need a reservation for parking or lodging that provides access to the mountain. Novices (and some intermediates) need lessons. At some point, you need to eat, drink, and sleep. And of course, there is the lift pass or ticket required to go down the mountain.

---

[1] For the purposes of this Complaint, "downhill skiing" or "skiing" include snowboarding.

49.    For Destination Ski Resorts, their business comprises all services related to providing access to downhill skiing at a resort, including but not limited to providing lifts, ski patrol, and snowmaking; designing, building, and grooming of trails; providing skiing lessons; and other ancillary services.

50.    The Destination Ski Package that Destination Ski Resorts, including Resort Defendants and their affiliated ski resorts, market and sell to consumers consists of all ski-related or snowboard-related purchases, including but not limited to the lift pass or ticket, ski or snowboard lessons, ski or snowboard rentals, and other ancillary ski products and services that are part of their ski trips.

**B. Resort Defendants, Led by Vail and Alterra, Gain Control of the Destination Ski Resort Market Through Anticompetitive Acquisitions and Season Pass Alliances.**

### 1. *Vail goes public and starts acquiring Destination Ski Resorts.*

51.    Vail opened its doors in what is now called Vail, Colorado in 1962. Although it started with just one gondola and two chairlifts, Vail quickly grew into one of the most prominent ski areas in North America. In 1980, Vail opened Beaver Creek, 10 miles west of Vail, as its second ski area.

52.    In 1992, private equity entered the picture. Apollo Ski Partners acquired Vail Associates and incorporated Vail Resorts, Inc. By 1997, Vail owned and operated three mountains in Colorado: Vail, Beaver Creek, and Arrowhead Mountain.

53.    That year, Vail proposed to acquire Ralston Resorts, Inc. ("Ralston"), through which it acquired two Destination Ski Resorts in Colorado: Keystone and Breckenridge. Vail and Ralston were the two largest owners/operators of ski resorts in Colorado at the time.

54.    After its acquisition of Ralston, Vail went public.

55.    Vail soon expanded beyond Colorado's borders, purchasing the Grand Teton Lodge Company in 1999 and Heavenly Mountain Resort in California in 2002.

### 2.    *Vail creates the Epic Pass.*

56.    In March 2008, Vail announced the "groundbreaking initiative" of the Epic Pass, which allowed for unlimited skiing and lift riding across its five Destination Ski Resorts with 17,400 acres of terrain, 128 chairlifts and 722 trails. Covering its four resorts in Colorado and one resort in California for $579, this multi-mountain pass was for sale until November 15, 2008, after which date customers had to pay the single-day lift ticket at Vail of $92.

### 3.    *Vail acquires more Destination Ski Resorts and other Regional Ski Areas that use the Epic Pass.*

57.    Between 2010 and 2017, Vail began a period of rapid expansion, prompting one ski publication to jokingly write that Vail had "secured the rights to all North American snowfall for the 2018/19 season."

58.    During this period, Vail acquired Northstar (California), Afton Alps (Minnesota), Kirkwood Mountain Resort (California), Mount Brighton (Michigan), Canyons Resort (Utah), Park City (Utah, merged with Canyons into one resort), Wilmot Mountain (Wisconsin), Whistler Blackcomb (Canada), and Stowe Mountain (Vermont) to its portfolio. This series of acquisitions included multiple Destination Ski Resorts such as Canyons, Park City, and Whistler Blackcomb, as well as Regional Ski Areas like Mount Brighton and Wilmot Mountain. Most of these acquisitions were not subject to HSR review.

59.    By 2016, the Epic Pass sold for $809 and included unlimited skiing at twelve Vail-owned resorts in the United States. Vail reported that its season pass products accounted for 40% of its lift revenue for the previous ski season.

### 4.    *Alterra is formed and acquires numerous Destination Ski Resorts.*

60.    In mid-2017, private equity firm KSL Capital Partners, LLC ("KSL"), owner of Palisades Tahoe, and Henry Crown & Company, owner of Aspen Skiing Company, teamed up to form Alterra Mountain Company ("Alterra").

61.    Alterra immediately acquired Intrawest, which owned or operated six mountain resorts, as well as KSL's Palisades Tahoe and Mammoth Resorts.

62.    After completion of the deal, Alterra owned twelve four-season mountain resorts in North America: Squaw Valley, Alpine Meadows, Mammoth Mountain Ski Area, Snow Summit, Bear Mountain and June Mountain in California; Steamboat Ski & Resort and Winter Park Resort in Colorado; Blue Mountain Ski Resort in Ontario; Mont Tremblant Resort in Quebec; Stratton Mountain Resort in Vermont; and Snowshoe Mountain Resort in West Virginia. Today, these resorts average six million annual skier visits with 20,000 skiable acres.

### 5.    *Alterra releases the Ikon Pass and partners with Boyne and Powdr.*

63.    Only a few weeks after acquiring Intrawest, in late January 2018, Alterra introduced its own multi-mountain Ikon Pass. Absent agreement, this was and should be the industry's primary direct competitor to the Epic Pass.

64.    In the news release announcing the Ikon Pass, Alterra remarked that "North America's top mountain destinations have joined together to offer skiers and riders the Ikon Pass uniting 12 destinations from Alterra Mountain Company and 11 premier destination partners."

17

Alterra also noted that the Ikon Pass was "a collaboration of seven industry leaders" that included Alterra, Boyne, and Powdr. Alterra Chief Marketing Officer Erik Forsell added that the Ikon Pass represented "a collaboration of like-minded mountain destinations" and a "curated []" community of iconic destinations."

65.    Alterra's "premier destination partners," including Boyne and Powdr, praised the Ikon Pass collaboration in the same release. Boyne President Stephen Kircher stated that "Boyne Resorts' Big Sky Resort, Loon Mountain, Sunday River and Sugarloaf are thrilled to collaborate with mountain destinations that share our passion for terrain and the guest experience, and to create a pass that provides the most iconic skiing and riding in North America." Powdr Chief Revenue Officer Wade Martin said that "we are proud to collaborate on the inaugural Ikon Pass with the inclusion of POWDR's Killington, Eldora and Copper Mountain."

66.    The Ikon Pass officially went on sale for the 2018-2019 season in spring 2018 with an initial price of $899—the same price as the Epic Pass.

### 6. Resort Defendants consolidate control in the Destination Ski Resorts industry.

67.    Soon after Alterra's entrance into the market and release of the Ikon Pass, Vail continued apace with its acquisition strategy while Boyne joined the fray.

68.    In 2018, Vail acquired three additional ski areas: Crested Butte in Colorado, Mount Sunapee in New Hampshire, and Okemo in Vermont (a Destination Ski Resort).

69.    Also in 2018, Boyne re-purchased six ski resorts in North America that it had been operating under a long-term lease for the past decade. Among the acquired properties were two domestic Destination Ski Resorts located in Maine: Sunday River and Sugarloaf.

70.    In 2019, Vail purchased Peak Resorts, which gave it 17 additional U.S. ski areas near major metropolitan areas, including Hunter Mountain (New York), Mount Snow (Vermont), Attitash Mountain Resort, Wildcat Mountain, and Crotched Mountain (New Hampshire), Liberty Mountain Resort, Roundtop Mountain Resort, Whitetail Resort, Jack Frost, and Big Boulder (Pennsylvania), Alpine Valley, Boston Mills, Brandywine, and Mad River Mountain (Ohio), Hidden Valley and Snow Creek (Missouri), and Paoli Peaks (Indiana). Then CEO of Vail, Rob Katz explained: "With this acquisition we're also able to make a much stronger connection to guests in critical cities in the Mid-Atlantic and Midwest, and build on the success we have already seen with our strategy in Chicago, Minneapolis and Detroit."

71.    The so-called "feeder hill strategy" was announced by Vail in 2012 when it explained the plan "to drive season pass sales and build broader guest loyalty by looking at premier Regional Ski Areas located near major urban markets."

72.    In 2019, Vail announced that its Epic Pass at $939 would cover all of its mountains. Likewise, Alterra announced that the Ikon Pass would cover 38 global winter destinations, with unlimited access to the twelve mountains owned by Alterra. The price increased to $919 for renewal passes and $949 for new passes.

73.    In 2021, Vail closed an acquisition of three Pennsylvania ski properties: Seven Springs Mountain Resort, Hidden Valley Resort, and Laurel Mountain Ski Area. Vail referred to Seven Springs as "Pennsylvania's premier four-season family resort," located an hour from Pittsburgh and "among the largest ski resorts in Pennsylvania with 285 skiable acres and 750 vertical feet," with "significant resort amenities, including a 418-room hotel, conference center, a full-service spa and tubing." Vail may not be done acquiring Destination Ski Resorts. On a

December 2024 earnings call, former CEO Kristen Lynch said that Vail always looks for "more families or owners of assets who want to make a transition" and believes "there are specific areas in North America we would like to acquire."

74. Vail said in late 2024 that it would focus on profit maximization through "cost efficiencies" like layoffs. At the same time, its CEO was positioned to earn more than $3 million in annual total compensation despite complaints about overcrowding, excessive prices, and a generic experience at its resorts.

75. In 2023, Alterra acquired Schweitzer, a Destination Ski Resort located in Idaho. And in 2024, Alterra acquired Arapahoe Basin in Colorado.

76. For Alterra, controlling access to Destination Ski Resorts across North America has been its core business model since its inception, and it is positioned to continue with this trend in the coming years. As *The Denver Post* reported when Alterra launched the Ikon Pass in 2018, the company was created by "corralling a dozen top-tier destination ski resorts" and immediately leveraged those assets to introduce a pass offering "a blend of limited and unlimited skiing on 50,000 acres across 23 resorts in nine states and three Canadian provinces." The Ikon Pass prominently featured various "coveted resorts" widely regarded as top Destination Ski Resorts.

77. Alterra has the financial backing to continue expanding well into the future. In 2024, KSL announced a $3 billion-plus continuation investment vehicle for Alterra. According to KSL's CEO, this allowed it "to continu[e] to work with Alterra in its next stage of growth."

20

### 7. Resort Defendants have market power over domestic Destination Ski Resorts.

78.    Vail and Alterra, along with Boyne and Powdr, have considerable market power and control over the Destination Ski Resort market in the United States.

79.    Today, Vail owns or operates 42 ski areas, including 11 Destination Ski Resorts in the United States, and Alterra owns or operates 16 ski areas, including nine Destination Ski Resorts in the United States. Boyne and Powder each currently own or operate three Destination Ski Resorts in the United States (Powdr owned or operated a fourth Destination Ski Resort, Killington, until late 2024).

80.    The following map illustrates the considerable scope and extent of Resort Defendants' presence in this market:



81.    The Destination Ski Resorts in the United States are listed in the following table, with highlights indicating whether each mountain accepts the Epic Pass (blue) or Ikon Pass (green):

**Table A**

| | MOUNTAIN | VTF/h | Lift-Served Vertical Drop (feet) | Lift-Served Skiable Acres | OWNER | PASS |
|---|---|---|---|---|---|---|
| 1 | Vail Mountain | 79,958,488 | 3,450 | 5,317 | Vail | Epic |
| 2 | Deer Valley | 71,668,590 | 3,040 | 4,926 | Alterra | Ikon |
| 3 | Palisades Tahoe | 65,615,980 | 2,850 | 6,000 | Alterra | Ikon |
| 4 | Park City | 63,041,700 | 3,226 | 7,300 | Vail | Epic |
| 5 | Steamboat | 54,807,760 | 3,668 | 3,741 | Alterra | Ikon |
| 6 | Mammoth | 51,700,280 | 3,100 | 3,500 | Alterra | Ikon |
| 7 | Breckenridge | 51,072,890 | 3,240 | 2,908 | Vail | Epic |
| 8 | Beaver Creek | 50,600,400 | 3,340 | 2,082 | Vail | Epic |
| 9 | Keystone | 46,435,400 | 2,920 | 3,149 | Vail | Epic |
| 10 | Heavenly | 42,568,550 | 3,475 | 4,800 | Vail | Epic |
| 11 | Snowmass | 41,092,736 | 4,400 | 3,342 | Aspen | Ikon |
| 12 | Big Sky | 40,614,972 | 4,350 | 5,850 | Boyne | Ikon |
| 13 | Winter Park | 39,088,000 | 3,060 | 3,081 | Alterra | Ikon |
| 14 | Copper Mountain | 38,357,193 | 2,729 | 2,538 | Powdr | Ikon |
| 15 | Sugarbush | 35,319,551 | 2,600 | 581 | Alterra | Ikon |
| 16 | Sun Valley | 35,298,577 | 3,400 | 2,829 | Holding Family | Ikon |
| 17 | Killington | 35,200,000 | 2,977 | 1,509 | Independent (formerly Powdr) | Ikon |
| 18 | Snowbasin | 33,823,800 | 3,002 | 3,000 | Holding Family | Ikon |
| 19 | Mount Bachelor | 33,591,800 | 3,365 | 4,323 | Powdr | Ikon |
| 20 | Jackson Hole | 31,054,366 | 4,139 | 2,500 | Independent | Ikon |
| 21 | Sunday River | 29,975,790 | 2,350 | 1,184 | Boyne | Ikon |
| 22 | Telluride | 29,102,735 | 3,790 | 2,000 | Independent | Epic |
| 23 | Okemo | 27,359,100 | 2,200 | 667 | Vail | Epic |
| 24 | Snowbird | 26,796,060 | 3,240 | 2,500 | Powdr | Ikon |
| 25 | Sugarloaf | 26,317,225 | 2,748 | 1,360 | Boyne | Ikon |
| 26 | Northstar | 26,097,300 | 2,280 | 3,170 | Vail | Epic |

| | MOUNTAIN | VTF/h | Lift-Served Vertical Drop (feet) | Lift-Served Skiable Acres | OWNER | PASS |
|---|---|---|---|---|---|---|
| 27 | Mount Snow | 24,139,420 | 1,700 | 601 | Vail | Epic |
| 28 | Stratton | 23,800,400 | 2,003 | 670 | Alterra | Ikon |
| 29 | Stowe | 23,672,500 | 2,360 | 485 | Vail | Epic |
| 30 | Schweitzer | 21,395,600 | 2,429 | 2,900 | Alterra | Ikon |
| 31 | Crystal Mountain | 21,144,100 | 2,602 | 2,300 | Alterra | Ikon |
| 32 | Stevens Pass | 19,905,160 | 1,784 | 1,125 | Vail | Epic |

83.     Vail and Alterra own all top 10 domestic Destination Ski Resorts and 20 of the 32 total domestic Destination Ski Resorts. For most of the Class Period the Resort Defendants owned 27 of the 32 Destination Ski Resorts in the United States and currently own 26. If all Destination Ski Resorts had equal skier visits and revenue, Resort Defendants would control at least 81% of the market. This estimate is conservative because skier visits and revenue skew higher towards the top of this list. For example, Vail reports that it owns the first, second, fourth, ninth and tenth most-visited ski resorts in the United States.

**C. Threats to Resort Defendants' Financial Stability Create Strong Incentives to Collude.**

84.     By the time that Resort Defendants' acquisition campaign had caused the industry to further concentrate in the hands of a few dominant players and most Destination Ski Resorts had partnered with either Vail or Alterra on season passes, the ski industry in general, and Resort Defendants in particular, had grown increasingly concerned about the uncertainty climate change posed to their collective financial stability.

85.     In Vail's 2020 10-K Annual Report, the company identified climate change as a major "risk factor" that could "adversely effect [its] financial position, results of operations, and cash flows." Drilling down on this threat, Vail stated that "[t]he effect of climate change,

23

including any impact of global warming, could have a material adverse effect on our results of operations as a result of increased weather variability and/or warmer overall temperatures, which would likely adversely affect skier visits and our revenue and profits."

86.     Boyne and its President and CEO Stephen Kircher similarly recognized that "[h]uman-driven climate change is an urgent issue for the world and most certainly for the snowsports industry." No later than 2019, Boyne started developing its ForeverProject Master Plan, which it published in early 2021, to "help inform, motivate, and educate others in this critical effort" to "[m]itigat[e] the impacts of climate change[.]"

87.     NSAA issued similar words of caution. The organization stated that: "[c]limate change is one of the most significant, long-term challenges facing the snowsports industry;" "[s]ki areas are on the front lines of climate change;" and "ski areas face increasing uncertainty from climate-related risks." In the "Sustainability" section of its website, NSAA characterized "climate change" as "our number one threat." It remarked that "as ski areas feel the effects of climate change, we must be part of broader climate solutions." The organization also discussed how it "is working toward a sustainable future for the mountain resort industry," noting its "climate change advocacy" to "rais[e] the collaborative business voice of the ski industry" and its "resiliency" efforts to "plan for the future" while "protecting our people, natural places, and infrastructure from climate risks."

88.     Resort Defendants' collective concern prompted these "four largest ski industry leaders" to "announce [their] joint commitment to fight climate change" through the "Climate Collaborative Charter" in June 2021. Leading with the statement "Alterra Mountain Company, Boyne Resorts, POWDR and Vail Resorts Unite," their joint release stated that "[a]ll four ski

industry leaders have agreed to operate their respective resorts with sustainability at the forefront and use their collective voice to advocate for effective public policy on climate action." Under the collaboration, Resort Defendants committed "[a]s business leaders," among other things, to "[s]hare best practices to accelerate change in their respective companies and communities," [s]upport the National Ski Areas Association's Sustainable Slopes platform," and to "[p]lace ***collaboration over competition*** when it comes to sustainability." Resort Defendant representatives also relayed their company's "commitment" to this "collaboration." For example, Powdr Director of Corporate Responsibility Laura Schaffer discussed the "importance of collaboration" and the need to "***reach across the chairlift to work together***[.]" Addressing the timing of Resort Defendants' first discussion about the collaboration, Boyne's Kircher stated: "The idea for ***the four of us to unite*** in this pledge to combat climate change was actually formed at an industry conference in October of 2019 and it has endured many iterations and diligent review to get us to where we proudly are today."[2]

89.     The threat climate change presented to Resort Defendants' financial health was exacerbated by the Covid-19 pandemic that first hit the United States during the 2019/20 ski season. The pandemic caused the resorts substantial losses, which increased the pressure on each of them to recoup those losses through higher prices and other anticompetitive means.

---

[2] The antitrust laws recognize that the process of competition is the ultimate driver of innovation. "Collaboration" among horizontal competitors undermines that process, deters innovation, increases prices, and decreases consumer welfare. For example, agreements to reduce energy use will provide benefits to Defendants in the form of lower costs, but without competition those benefits need not be extended to consumers. Increased costs, by contrast, will most likely be passed on to consumers without competition. Defendants have not publicly disclosed specifically how they have chosen to collaborate rather than compete.

90.     Resort Defendants all experienced significant financial strain from the pandemic—and took similar action in response. For example, on September 14, 2020, Alterra CEO Rusty Gregory released a statement about its operational plans for the upcoming ski season, writing that Alterra would be "controlling resort visitation levels to avoid overcrowding" by "prioritizing access for season pass holders" and planning to "tightly regulate the number of daily lift tickets that will be available by advance purchase only." Ten days later, Vail CEO Rob Katz stated in a release that the company would need to implement a reservation system giving preference to season pass holders and limiting lift ticket sales, among other operational changes. including ski school, food and beverage and retail/rental that tend to rely more heavily on destination guests."

91.     On top of these concerns, Resort Defendants faced an aging customer base and flat-lined total number of participants. In late 2018, NSAA created a Growth Committee with participation from the Resort Defendants and RRC. NSAA's then-president Kelly Pawlak explained, "We all have to work together on this. It's not about one resort stealing visits from another." The committee identified three areas of focus: (1) gaining a deeper understanding of core skiers; (2) figuring out how to get the ever-growing population of season passholders to use their passes more often; and (3) concentrating on the lifestyle of skiing versus the sport.

92.     Heading into the Class Period, these severe threats motivated and incentivized Resort Defendants, with the active encouragement and assistance of NSAA and RRC, to start working together in earnest to protect their collective market position and profits.

26

**D. Defendants Unlawfully Exchange Information and Fix Prices for Destination Ski Packages.**

93. Starting no later than January 2020, Defendants engaged in an unlawful information exchange in the Destination Ski Resort market and an illegal conspiracy to fix the prices of Destination Ski Packages.

94. Resort Defendants knowingly and intentionally shared the same categories of current, non-public business information concerning Destination Ski Package products and services with RRC at NSAA's behest. RRC used this information to prepare detailed benchmarking reports for NSAA members, including Resort Defendants, each year before the new ski season. Resort Defendants used the information in these reports to help inform and guide the business decisions and strategies that they would implement for the upcoming ski season. Additionally, under the guise of consulting agreements between major Resort Defendants and RRC, these Defendants benefitted from the resort-specific confidential business data RRC maintained and used in advising them on business decisions and strategies concerning pricing and other important financial and operational topics.

95. Defendants engaged in other coordinated actions that, taken with their information exchange, evidence an overarching price-fixing conspiracy. Alterra, Boyne, and Powdr—the "Ikon Pass Resort Defendants"—knowingly and intentionally used the same e-commerce platform and dynamic pricing module provided by a company that one of these Defendants co-owned and managed. In doing so, these Defendants employed standardized pricing, inventory, and other data categories and formatting and could deploy the same pricing strategy for Destination Ski Packages. Further, Defendants' relevant personnel directly discussed

27

Destination Ski Package pricing, revenue, costs, and other sensitive business information with one another at recurring NSAA gatherings.

### 1. *NSAA and RRC work closely with Resort Defendants to shape their business strategies and conduct.*

96.     NSAA describes itself as "the trade association for ski area owners and operators." It represents over 300 ski resort members that account for more than 90% of nationwide skier and snowboarder visits and hundreds of supplier members that provide equipment, goods, and services to the industry. NSAA's stated "mission" is to "support members in their pursuit to operate thriving and sustainable businesses and deliver exceptional experiences." To execute this, NSAA "analyzes and distributes ski industry statistics" and "produces annual conferences and tradeshows," among other things.

97.     NSAA's primary purpose is to serve and benefit its members. Significant portions of the NSAA website are open only to members. These include an entire section for "Members" as well as various pages located across the site, including "Committees" in the "About" section, "Member Alerts," "NSAA Journal," and "Digital Learning" in the "Education" section, the entire "Government" section, and "Member Only Products" in the "Store" section. One must sign in with a username and password to access any of these areas, as shown below:



98.     By similar token, NSAA publishes a bi-weekly newsletter exclusively for members and holds numerous trade shows and conferences, including the National Convention and Trade Show each spring, the Mountain Technology Symposium each fall, and the Winter Conference and Trade Show, at various locations across the country.

99.     Resort Defendants' executives occupied key NSAA leadership roles, including by serving on its Board of Directors and sitting on important committees like the Economics Committee during the Class Period. For example, in 2020-21, Pat Campbell of Vail began a two-year period as Vice Chair followed by a two-year period as Chair starting in 2022 and then Immediate Past Chair starting in 2024. Alterra's Win Smith was in the role of Immediate Past Chair starting in 2020 for a two-year period. Stephen Kircher of Boyne Resorts served as Secretary in 2021-22, Treasurer for a two-year period starting in 2022, and Vice Chair for a two-year period starting in 2024. Powdr had Mike Solimano of Killington Resort serving as Secretary in 2023-24 and Dave Fields from Powdr's Snowbird Mountain started serving as Treasurer in 2024.

29

100.    RRC is a "research and analysis" firm that occupies a unique position as "the leading consulting and market research firm" for the ski industry. RRC highlights the "custom data" compilations and "strategic insights," among other services, that it provides clients. It does not purport to "offer canned, 'one size fits all' reports that may or may not provide the direction [clients] need." Rather, RRC "dive[s] deep into the industry niche of every client" and *applies its* "*experience to provide analysis and insights that ensure decisions are strategic and on target*." RRC thus has little reason to employ "a sales team or invest a lot of time chasing new business." Indeed, "[m]ost of [its] clients come back over and over because they know [it] provide[s] a *total research solution along with insights they can't find anywhere else*."

101.    RRC enjoys a close relationship with NSAA. It is "a key member of NSAA's Growth Committee." In that role, it "provides consumer data analysis and consulting" to NSAA "to support long-term industry development."

102.    RRC also serves as NSAA's "core research partner, leading the most comprehensive national studies on the mountain resorts and snowsports industry." RRC conducts several "flagship studies" for NSAA, including two discussed in detail below, that "shape industry trends, business decisions, and policy initiatives that impact the future of snowsports."

103.    "Beyond national research," RRC "regularly contribute[s] to NSAA's efforts by presenting at NSAA events, publishing insights in the NSAA Journal, conducting custom data analyses for policy initiatives, legal cases, and industry benchmarking."

104.    "RRC also manages NSAA's historical datasets, overseeing the organization, maintenance, and analysis of vast industry data." In this capacity, the firm "provide[s] custom reports, data pulls, and statistical insights to support NSAA's evolving needs. To enhance

30

NSAA's research capabilities," moreover, "RRC developed an interactive digital database, offering ***real-time access to critical industry data***."

### 2. Resort Defendants share confidential business data with NSAA and RRC and access it, through RRC's consulting services, to help set prices and make other business decisions.

105. In coordination with NSAA and its participating member resorts, RRC prepares annual reports addressing statistics and trends relevant to the business of Destination Ski Resorts. It also provides access to granular, resort-level business data to Destination Ski Resorts clients, including certain Resort Defendants, under the auspices of confidential consulting engagements.

106. NSAA works with Resort Defendants and RRC to compile and circulate annual data-based reports on subjects important to Destination Ski Resort operators' bottom lines. The Economics Committee of NSAA's Board of Directors, in coordination with RRC, oversees the preparation and circulation of these reports.

107. On an annual and rolling basis, NSAA issues formal invitations to members to participate in industry surveys with summary results published in annual reports. These solicitations are not merely requests for participants' historical data. As discussed below, they are entryways into consulting relationships with RRC that provide its Resort Defendant clients with exclusive, granular insight into confidential business information of their competitors.

108. Each year, under the authority vested in it by NSAA, RRC undertakes an extensive survey process with participating member resorts. Using the granular information obtained from participating resorts, RRC drafts comprehensive reports detailing and analyzing aggregate statistics and trends relevant to resorts' business operations and strategies. Two

particularly relevant reports are the NSAA Kottke End of Season & Guest Experience Study and the NSAA Economic Analysis of United States Ski Areas.

109.    The NSAA Kottke End of Season & Guest Experience Study ("Kottke Report") "includes statistics and analysis from the most recent ski season" to "provid[e] a holistic view of the U.S. ski industry." The Kottke Report incorporates and addresses various categories of "operational and demographic data" from participating resorts, including all Resort Defendants.

110.    The Kottke Report chapter on "Ski Area Operations" "covers details" like "days of winter operation, skier visits by location/size/month, actual opening and closing dates compared to scheduled opening and closing dates, unscheduled midseason closures, tickets and passes, ticket price/yield/yield ratio, lessons and equipment rentals, summer operations, capital expenditures, and other topics."

111.    The "Ski Area Operations" section titled "Ticket Price, Yield, and Yield Ratio" provides "Average Adult Weekend Ticket Price," "Average Total Ticket Yield," "Average Ticket Yield Ratio," and "Percent of Daily/Multi-Day Ticket Revenue from Window Ticket Sales" for each season from 2014/15 to 2023/24 nationwide, by region, and by ski area size, along with related commentary. This section of a recent Kottke Report, for example, stated that "[t]he national average adult weekend ticket price has steadily increased, reaching a new high of $192 in the 2023/24 season," which "represents a near doubling in average price over the ten-year span (+98%), and a 5% increase year-over-year." It also noted that "the national average total ticket yield has consistently increased across the past decade, from $46 in 2014/15 to $74 in 2023/24," because "while skier visits" were "on an upward trend, ticket and pass revenue []
increased at an even faster rate."

112.    Other parts of the "Ski Area Operations" chapter provide data and related commentary on subjects including advance purchase requirements for lift tickets, partial-day timed lift access sessions, maximum capacity of lift tickets sold, and lift access reservations.

113.    The Kottke Report contains a section on "Data Confidentiality" that addresses the types of resort-level data RRC and NSAA use to prepare the report and under what circumstances they may share such data with others, including competing Resort Defendants.

114.    For example, the 2023/24 Kotke Report's "Data Confidentiality" section stated that the "confidential" resort-level data would be "used as part of broader, aggregated data set of ski area information that is compiled, analyzed, and published for industry use." It also noted (incorrectly, as discussed later) that "RRC Associates is the only entity that will have access to ski-area-specific data" and that "only" its "authorized employees will be permitted to access this data."

115.    The "Data Confidentiality" section then clarified:

> Unless compelled by statute, regulation, law, or any court of competent jurisdiction, ***ski-area-specific survey data obtained from a ski area (or ski areas as part of a corporation) that names or identifies that ski area or corporation will not be released***.

116.    Pursuant to these terms, therefore, RRC and NSAA ***could share with one Resort Defendant the resort-level data of another Resort Defendant without restriction*** as long as they did not name or identify the specific Resort Defendant when doing so.

117.    The "Data Confidentiality" section further required "any outside entity seek[ing] underlying, non-aggregated survey data" to "make a request or demand of such data directly to the individual ski area or corporation." NSAA and RRC explained that safeguarding and maintaining confidentiality of resort data was necessary for "encouraging and ensuring

comprehensive participation in collecting this information" and ensuring their "ability to obtain accurate and comprehensive data . . . for use in the ski industry's research and resulting publications." NSAA and RRC did not state, however, that this sort of request would be improper or anticompetitive or that they would respond to such a request accordingly. Rather, they merely noted that "individual ski areas or corporations may enter into separate confidentiality or data protection agreements with NSAA that separately outline the terms and conditions of the use of such survey data," and that if either one was asked to share specific, identifiable resort or corporation data, NSAA simply would "notify the ski area or corporation in writing as soon as possible."

118. Participating resorts submit their data to RRC by June of each year. RRC cleans and integrates the data into its historical database. Finally, NSAA releases the report one month later in July of each year.

119. RRC representatives report on findings from, and forecasts based on, the Kottke Report at the NSAA National Convention and Trade Show held each spring.

120. The NSAA Economic Analysis of United States Ski Areas ("Economic Analysis") addresses "economic and financial trends and patterns of interest in the ski area industry nationally, regionally, and by ski area size grouping" based on detailed data received "disproportionately" from "larger ski areas," including all Resort Defendants, "compared to the overall distribution of U.S. ski areas" and the ski areas participating in the Kottke Report. The Economic Analysis includes an "in-depth review of critical ski area financial data, which uses basic ski area characteristics (size, location, days of operation, capacity, skier visits, lift ticket prices, etc.), critical economic ratios, profitability, regional variations and other measures." The

34

granular, resort-specific data received from participating resorts that inform RRC's analysis cover various revenue and operations categories, including ones for ticket sales/checking, snowplay/tubing, lessons, rental shops, and accommodations.

121.    To ensure standardization of the data received from participants and standardization across reporting results, the NSAA Board's Economic Committee defines various general terms and Income Statement and Balance Sheet items on the survey form sent to participants for the Economic Analysis. For instance, the Committee provides detailed definitions for terms like "Design Capacity" and "Snowsports visit/day," "Concession Expense," and "Year-Round Rental Shops."

122.    The Economic Analysis survey participants receive consists of seven pages of questions and a set of linked defined terms. The survey instructs resorts to upload their completed forms directly to RRC through a link.

123.    Reporting ski resorts, including Resort Defendants, provide numerous categories of revenue, expense, profit, capacity, supply, and demand data to RRC and NSAA for use in the annual Economic Analysis.

124.    The Economic Analysis releases aggregate average figures for the following resort-derived categories of data—which encompass every significant ski industry business metric—nationally, regionally, and by ski area size for each of the past 10 seasons:

> Ski Area Size Characteristics:
> ○ skiable acres
> ○ design capacity[3]

---

[3] Design capacity, one of the two metrics used to quantify ski resort area capacity, is defined as the optimum number of skiers a ski area can handle during one day. Per the NSAA Economic Committee, "one estimation technique is to divide your area's VTF/Hr by a vertical transport feet per hour demand

- ○ VTF/h[4]
- ○ percent with night skiing
- ○ percent operating under USFS permit
- ○ percent operating under State permit
- ○ peak day skier visits
- ○ total visits
- ○ days of winter operation

Ski Area Economic Characteristics:
- ○ annual revenue per skier visit
- ○ winter revenue per skier visit
- ○ annual ticket revenue per skier visit
- ○ winter ticket revenue per skier visit
- ○ non-ticket revenue per skier visit

Summary Financial Data:
- ○ total gross revenue
- ○ operating expenses
- ○ operating profit/loss
- ○ EBITDA
- ○ depreciation
- ○ amortization
- ○ interest
- ○ profit/loss before tax
- ○ operating profit margin
- ○ EBITDA margin
- ○ pre-tax profit margin

Balance Sheet:
*Assets*
- ○ current assets
- ○ gross fixed assets
- ○ accumulated depreciation
- ○ other assets
*Liabilities*

---

factor for your region. The estimated demand factor is 2,100 VTF/Hr for the Northeast, Rocky Mountain, and Pacific West regions, and 1,800 VTF/Hr for the Midwest and Southeast regions. For example, a ski area in the Northeast with 10,000,000 VTF/Hr would have a design capacity of 4,762 (10,000,000/2,100) skiers per day."

[4] VTF/h, the other metric used to quantify ski resort area capacity, is short for vertical transportation feet per hour. This is what the NSAA Economic Committee uses to classify ski area size. VTF/h represents a consistent and stable metric for categorizing size year over year and avoids the volatility inherent in other measures, such as gross revenue or skier visits, which can change annually due to external factors.

- current liabilities
- long-term debt
- subordinated debt
- deferred taxes
- other liabilities

*Net Worth*
- invested capital
- retained earnings
- treasury stock

*Balance Sheet Ratios*
- net working capital
- current ratio
- percent liabilities
- percent equity

Departmental Revenues and Revenue Per Snowsports Visit:[5]
- lift tickets and passes
- snowplay/tubing
- lessons
- food and beverage
- retail stores
- rental shops
- accommodations/lodging
- miscellaneous
- other
- property operation

Summer Operations and Revenue:
- percent of areas with summer operations
- average percent of revenue
- downhill/lift served mountain biking
- cross country mountain biking
- zip lines
- golf
- water features
- alpine slide/mountain coaster
- chairlift rides
- ropes course/challenge course
- other attractions
- accommodations/lodging

---

[5] This section also provides the percent of annual revenue and percent of lift ticket/pass revenue for each listed category. A recent Economic Analysis reported, for example, that average annual revenue for lift tickets and passes per visit was $87.87 in the 2023/24 season, up from $80.30 the prior season.

- retail store
- rental shop
- food and beverage
- groups/weddings/conferences
- special events (festivals, concerts, etc.)
- other summer revenue
- total summer revenue

Expenses and Expenses Per Snowsports Visit:[6]
- cost of goods
- direct labor
- maintenance/repairs
- other direct
- payroll taxes/workers' compensation
- electric power/fuel
- general and administrative
- marketing/advertising
- insurance
- land use fees
- property/other taxes
- miscellaneous
- depreciation
- amortization
- operating leases
- interest
- profit before tax
- total gross revenue

Revenue, Expenses, and Margins by Department:[7]
*Mountain Operations*
- lift operations
- snowplay/tubing
- ski patrol
- grooming
- lift maintenance
- vehicle maintenance
- ticket sales/checking

---

[6] This section also provides the percent of annual gross revenue for each listed category.

[7] On the expense side, participating ski resorts report detailed data to the NSAA and RRC, with explanations of average expenditures by department. For instance, each participant reports its cost of goods, maintenance and repair costs, electric power and fuel, payroll taxes and benefits, and workers compensation for each operation listed.

38

- ○ snowmaking
- ○ snow removal
- ○ other

*Other Operations*

- ○ lessons
- ○ food and beverage
- ○ retail stores
- ○ rental shop
- ○ accommodations/lodging
- ○ miscellaneous (financial)
- ○ other (operating departments)
- ○ property operation

*Common Operations*

- ○ general and administrative department
- ○ marketing

Critical Ski Area Ratios:

- ○ VTF/h
- ○ design capacity
- ○ average snowsports visits
- ○ profit/loss before tax
- ○ depreciation and amortization
- ○ before tax cash flow
- ○ operating profit/loss
- ○ cash operating costs
- ○ gross fixed assets
- ○ long-term debt
- ○ equity

125. The Economic Analysis also provides "key findings" for each major data category, along with narrative explanations for each underlying data type.

126. For example, the 2023/24 Economic Analysis reported the following "key finding" for "Ski Area Economic Characteristics:"

> The 2023/24 fiscal year marked a record high across all key per-skier-visit metrics: annual and winter revenue per skier visit, annual and winter ticket revenue per skier visit, and non-ticket revenue per skier visit. Annual ticket revenue per skier visit has seen the most substantial growth, with a 59% increase over the past decade. Non-ticket revenue also reached a new peak, signaling a full recovery from COVID-19 impacts.

127. That season's Economic Analysis also noted the following about the underlying "ticket revenue per skier visit" numbers:

> Ticket and pass revenue per skier visit exhibited the most significant long-term growth. Annual ticket revenue rose by 7.2% year-over-year to $75.69, reflecting a 59.1% increase over the past decade, the highest growth rate among all per-skier-visit metrics. Similarly, winter ticket revenue per skier visit grew by 6.6% year-over-year, reaching $73.68, a 56.8% increase over the past decade.

128. Upon receiving each resort's data directly, RRC incorporates it into the broader historical dataset. The Economic Analysis analyzes a 10-year history of economic data.

129. Ski resorts participating in the Economic Analysis, including Resort Defendants, report discrete revenue categories that are not publicly reported elsewhere. For instance, each mountain reports revenue from snowplay or tubing, rental shops and retail stores. In contrast, Vail does not report these discrete revenue categories in its SEC filings but combines them into aggregate categories. Vail reports retail and rental in one revenue line and any revenue from snowplay or tubing is captured in the "Other" revenue line which includes such various revenue streams as summer revenues, employee housing revenue, guest services revenue, and private club revenue. Similarly, participating ski resorts report skier visits to individual mountains, but that information is not always available to the public. Since 2018, Vail has listed skier visits to all its North American properties as just one aggregate number in its Annual Report.

130. Defendants have engaged in efforts to keep certain reported data from public view. For example, most Destination Ski Resports resort reports land use fees, which are fees collected by the U.S. Forest Service in exchange for a permit to operate on public lands. Those fees are calculated based on various ski resort revenue streams and adjusted for mountain size.

40

Land use fees for individual ski resorts were made publicly available by the U.S. Forest Service until 2017, when Vail and NSAA objected to their release. According to former Vail executive Chris Jarnot, Vail objected to prevent "sensitive financial and commercial information from being discovered by its competitors who are vying for the same skiers and guests within the same or similar markets." NSAA simultaneously pushed for a consistent nationwide policy to prevent disclosure of individual land use fees, stating that "[t]he amount of permit fees that individual resorts operating on Forest Service land pay to the U.S. Treasury is confidential commercial and financial information . . . ." The U.S. Forest Service acquiesced and now only releases aggregated land use fee data to the public.

131.    The Economic Analysis contains a section on "Data Confidentiality" that addresses the types of resort-level data RRC and NSAA used to prepare the report and under what circumstances they may share such data with others, including competing Resort Defendants.

132.    For example, the 2023/24 Economic Study's "Data Confidentiality" section stated that the "confidential" resort-level data would be "used as part of broader, aggregated data set of ski area information that is compiled, analyzed, and published for industry use." It also noted (incorrectly, as discussed below) that "RRC Associates is the only entity that will have access to resort-specific data" and that "only" its "authorized employees will be permitted to access this data," before adding that RRC could share "certain data" with NSAA's Director of Finance to administer its by-laws and for "other" unspecified "limited purposes."

133.    The "Data Confidentiality" section then provided:

> Unless compelled by statute, regulation, law, or any court of competent jurisdiction, *resort-specific survey data obtained from a*

*ski area (or ski areas as part of a corporation) that names or identifies that ski area or corporation will not be released in any way by NSAA or RRC Associates*—whether to other ski areas, the media, the general public, other research organizations, parties involved in disputes or litigation, or any other individual or entity—*without express written authorization and consent from the ski area or corporation*.

134.    Under these terms, therefore, RRC and NSAA *could share with <u>one</u> Resort Defendant* either *resort-level data of <u>another</u> Resort Defendant that does not name or identify the Resort Defendant without restriction* or *resort-level data of <u>another</u> Resort Defendant <u>revealing</u> that Resort Defendant upon approval*.

135.    The "Data Confidentiality" section also required "any outside entity seek[ing] underlying, non-aggregated survey data" to "make a request or demand of such data directly to the individual ski area or corporation." NSAA and RRC noted that safeguarding and maintaining confidentiality of resort data was necessary for "encouraging and ensuring comprehensive participation in collecting this information" and ensuring their "ability to obtain accurate and comprehensive data . . . for use in the ski industry's research and resulting publications." Absent from this section were any statements that this sort of request would be improper or anticompetitive or that NSAA or RRC would respond to such a request accordingly. Instead, the section simply provided that "individual ski areas or corporations may enter into separate confidentiality or data protection agreements with NSAA that separately outline the terms and conditions of the use of such survey data," and that if either was asked to share specific, identifiable resort or corporation data, "NSAA will notify the ski area or corporation in writing as soon as possible."

136.    Participating resorts submit their data to RRC by September of each year. RRC integrates the data into its historical database. Finally, NSAA releases the survey in January of the following calendar year.

137.    NSAA included a list of all participating resorts, including Resort Defendants, in each edition of the Kottke Report and the Economic Analysis. Doing so informed Defendants which Destination Ski Resorts continued to participate in the information exchange and broader conspiracy. Doing so also allowed Defendants to monitor and police Resort Defendants' continued participation in these anticompetitive schemes.

138.    In describing its management of the resort-level data received from Destination Ski Resorts in preparing the NSAA-commissioned reports and studies, RRC notes that it "also manages NSAA's historical datasets, overseeing the organization, maintenance and analysis of vast industry data." In doing so, RRC "provides *custom reports, data pulls, and statistical insights*" and "developed an *interactive digital database, offering real-time access to critical industry data*," all to support NSAA's "evolving" needs.

139.    On behalf of NSAA, RRC has saved and maintained all this sensitive, resort-specific information as well as the aggregated information in a vast database. Each year, RRC adds to this trove the detailed business information it recently received from participating members, including Resort Defendants.

140.    As the consulting firm that compiles and produces the Economic Analysis for NSAA and its members, RRC collects and maintains all data produced by the participating ski resorts, including Resort Defendants. While RRC unsurprisingly does not appear to have publicly admitted that it provides direct access to resort-specific data obtained from survey

results outside of authorized employees, RRC does concede that it maintains and analyzes this data and the broader aggregated dataset of ski area information, to address issues of concern to the ski industry.

141.    RRC has had consulting relationships with Resort Defendants during the Class Period. Pursuant to these relationships and corresponding agreements (the terms of which have been kept private and confidential), RRC has provided consulting services to these clients on various operational matters.

142.    Beginning in 2020, RRC invited ski resorts to enter into consulting arrangements that would provide access to its extensive databases of "rich information about active skiers and snowboarders in the US, including geographic residence, demographics, equipment type and ability level, regions where they take trips, days of participation per season, ticket type used, and other participation patterns of interest."

143.    RRC also has promoted these consulting arrangements as a way for it to work with its ski resort clients to "*evaluate and quantify*" issues like "*ticket and pass pricing*" and "*competition*." "The information gathered and analyzed" by RRC "can be used in *strategic plans and pricing models, to name a few.*"

144.    RRC advertised that ski resort clients could use "*good data*" from its "*extensive databases*" and corresponding industry expertise to help solve "*thorny*" issues: "Do you have a thorny issue that would be easier to solve with some good data? *We can provide that data along with the insights and recommendations to maximize its value.*"

145.    By directly collecting the data from participants for the NSAA reports like those discussed above, RRC can integrate and use the data immediately upon receipt. The resort-

specific data at RRC's disposal is available for its use in advising Destination Ski Resort clients like Resort Defendants as they make decisions on prices for daily lift tickets, equipment rentals, and ski and snowboard lessons for the upcoming ski season.

146.    As RRC's clients, Resort Defendants have access to proprietary and sensitive data and information about their competition that they would not otherwise be able to obtain. For instance, RRC provided Vail with the total U.S. ski resort skier visits at all Destination Ski Resorts from the top 10 U.S. metropolitan markets.

147.    As another example, for Winter Park (Alterra), RRC relied on a combination of public and internal datasets to evaluate its "infrastructure, amenities, and guest experiences against a competitive set of nearby resorts." RRC's resulting deliverable provided Winter Park with a "data-driven understanding of its market position, helping to identify competitive advantages and areas for improvement."

148.    RRC also provides its consulting clients like Resort Defendants with custom research dashboards that include real-time data access and interactive data exploration. The interactive dashboards allow clients to "see the latest results and manipulate the data in myriad ways," such as by "compar[ing] data for locations or specific times of day," "to meet [their] custom objectives."

149.    In providing consulting services to Resort Defendants like Vail and Alterra, RRC *necessarily* has drawn upon and deployed its unparalleled institutional knowledge—based on the vast trove of non-public, resort-specific business data in its exclusive possession—to recommend pricing and other business actions that these clients have followed. By similar token, through

RRC, these Resort Defendants have uniquely benefitted from their competitors' non-public, competitively sensitive business data in ways that outsiders simply could not.

150.    By analyzing and maintaining this sensitive, resort-specific business data obtained from competing Resort Defendants—while simultaneously serving as those entities' fiduciary to help them formulate and execute their business strategies—RRC *cannot avoid* relying on its unique data-informed knowledge base in advising those clients on their business decisions. RRC's promotional statements, and common sense, support this conclusion.

151.    In December 2019, RRC published a list of its Destination Ski Resort clients, which included Vail and other individual resorts that other Resort Defendants owned, namely Copper Mountain Resort (Powdr), Deer Valley Resort (Alterra), Eldora Mountain Resort (Powdr), Killington/Pico Resort (Powdr), Mammoth Mountain (Alterra), Mt. Bachelor (Powdr), Park City Mountain Resort (Vail), and Squaw Valley/Alpine Meadows—now Palisades Tahoe (Alterra).

152.    Soon thereafter, starting in 2020, RRC publicized its Destination Ski Resort clients, including Vail, Alterra and resorts owned by Powdr and Boyne. RRC publicizes the same list of clients through today.

153.    By publishing a list of ski resort clients, including Resort Defendants, during the Class Period, RRC so informed Defendants which Destination Ski Resorts continued to participate in the information exchange and broader conspiracy. Doing so also allowed Defendants to monitor and police Resort Defendants' continued participation in these anticompetitive schemes.

154.    In sum, Resort Defendants, with the encouragement and enablement of NSAA and RRC, joined in an agreement to share confidential and proprietary information with their competitors, through these intermediaries, for the purpose, and with the effect, of fixing, raising, maintaining, and stabilizing the prices for Destination Ski Packages. Resort Defendants, enabled and facilitated by NSAA and RRC, knowingly and intentionally agreed to share confidential information with those intermediaries for use in common datasets and reports that also could be and were used by those intermediaries to help Resort Defendants make pricing and business decisions at each of their Destination Ski Resorts.

155.    During the Class Period, Defendants engaged in other coordinated actions that, taken together with the information exchange, evidence a conspiracy to fix, raise, maintain, or stabilize the prices of Destination Ski Packages. These actions are discussed below.

### 3. Ikon Pass Resort Defendants Use Aspenware to Standardize Business Data and Deploy the Same Dynamic Pricing Strategy.

156.    All Resort Defendants using Alterra's Ikon Pass knowingly and intentionally use the same e-commerce platform and dynamic pricing module—offered by Alterra-co-owned technology firm Aspenware Internet Solutions, Inc. ("Aspenware")—to standardize data reporting and set a common pricing strategy for Destination Ski Packages.

157.    Aspenware is a commercial technology provider "purpose-built for ski areas and mountain destinations." Owned by a 50-50 joint venture of Alterra and Aspen, it is "the go-to resource for over 50 ski resorts, providing a range of products and services that help its clients streamline back-office systems."

158.    The company's name is an "homage" to the aspen grove, "one of the largest organisms in the world, an interconnected root structure under the ground where each tree is part

47

of a larger root system," according to Aspenware CEO Rob Clark. "And that is kind of a metaphor for the way this technology is built, these individual software systems that are kind of interconnected behind the scenes."

159. Aspenware began as a consulting company for ski resorts in 2001. In 2015, Aspenware hired Rob Clark, who would later become its CEO, to help build a platform to manage all e-commerce operations for ski resorts. Clark previously worked at Vail, where he helped build its in-house e-commerce platform called EpicGuest, and then at RTP, where he worked on its resort management software offered to ski resorts.

160. In 2017, Aspenware began building custom software for ski resort clients that it soon would license to Destination Ski Resorts as a platform called Aspenware Commerce. Resort clients would use this platform to centralize all consumer purchases made at the resorts, including lift tickets, lessons, equipment rentals, meals, lodging, and entertainment. That year, Aspenware's first Destination Ski Resort clients, including Copper Mountain and Killington, signed onto the platform.

161. Aspenware soon changed its business model from providing hourly custom software development services for clients who owned the software, to owning the software itself and licensing it out to clients as a product. Clark, Aspenware's CEO, had this to say about the transformational effect this pivot had on the company and its Destination Ski Resort clients:

> And once we realized that Copper wanted it, Killington wanted it, and all these other resorts wanted it, we said, wait a minute, we might have something here. This might be something that other people might want, so we had to renegotiate the contracts with Bear Valley and Jackson Hole and did what's called an IP reassignment where they actually assigned the intellectual property back to us so we could lease it out. So that's kind of how it all got started. Fast forward to today, 60 resorts later, that was kind of the genesis of the

big change at Aspenware. From that point on, we really switched to what we call a product company. So where we build software that we own and then we license out to the resorts in order to use, and it's our job to maintain it, to grow it, to service it, and to enhance it over time.

162.    In summer 2021, Alterra and Aspen Skiing Company formed a joint venture to acquire Aspenware. The acquisition formally closed in May 2022.

163.    At the time of the Alterra-Aspen acquisition, resorts using Aspenware's e-commerce platform served over seven million consumers and processed two million transactions annually for such clients as Alterra, Boyne, and Powdr. At the time, all but one of the 40 resorts accepting the Ikon Pass were using Aspenware.

164.    Asked why Alterra and Aspenware wanted to purchase Aspenware and why Aspenware agreed, Clark responded in part with the following:

> I think that the reason it made sense to Aspen and Alterra particularly is that it may reflect a little bit of the difference between the Epic and the Ikon Pass. Most Epic resorts, pretty much all I think maybe except Telluride and a few international partners, are owned by Vail. ***There are 14 resorts at Alterra, but it's largely a partnership of resorts that have different ownership, some are independent, some are owned by larger groups like Boyne and Powdr. I think the difference between building in-house and building with an external company may actually reflect the structure of those passes and the structure of those companies. Most of the resorts in the Ikon Pass are our customers. I think we work with, if you include Alterra, we work with 39 or 40 of the 45 or so odd Ikon Pass resorts out there. We want to maintain the ability for Aspenware to work with them*** …. I think another reason we like that autonomy is that it's hard to develop and build software. It's hard to do it on its own. But it's really hard to do it in an organization that's also focused on the operations of the ski resorts…. That's enough to worry about, even for a large organization like Alterra. So having that kind of isolation where we don't have to worry about that, we just have to worry about our next software release and the capabilities that are going to be available there, kind of gives us an unfair advantage if you will…. So resorts

should really in my mind rely on technology vendors to provide that and should focus on the things that differentiate themselves that I kind of mentioned before, that kind of make them special. And I think that's kind of how Aspen and Alterra think about this.

165.    Further reflecting on the dynamics informing the acquisition, Clark commented that Aspenware "didn't have any outside investment" and "had to structure . . . our early contracts in a way that resorts paid us a lot up front and then less over time, because we needed the cash to be able to build software up front." While "we were really proud of what we had done," he noted, "we wanted to do so much more." That is where Alterra and Aspen came into the picture. Clark said that "the person who kind of closed the deal there was the President at the time and the new CEO of Alterra, Jared Smith, former President of Ticketmaster."[8] Smith's involvement was key to finalizing the deal according to Clark, since "there's a tech guy in charge now." Aspenware chose the Alterra-led group over two other suitors "because *we're ski industry folks*."

166.    Aspenware's current ownership structure is "a 50-50 joint venture made up of 100% of shares of Aspenware, Alterra owns 50%, Aspen Skiing Co. owns 50%."

---

[8] Smith's prior conduct at Ticketmaster featured at the recent Ticketmaster-LiveNation antitrust trial that governmental enforcers successfully tried before a federal jury. As one news outlet reported: "A former executive at Brooklyn arena Barclays Center testified Wednesday at a federal antitrust trial that he received a 'threat' from Ticketmaster and its parent company Live Nation when he floated signing with another ticketing brand in 2020…. The Department of Justice, suing Live Nation and Ticketmaster for Sherman Act antitrust violations, claims that the companies are 'monopolists' who use their dueling strangleholds over the live event promotion and ticketing industries as a one-two punch to keep artists and arenas from doing business with their competitors. Portions of Abbamondi's testimony Wednesday appeared to back that up, like when he harked back to a nearly decade-old conversation with Jared Smith, then the global chairman of Ticketmaster, who supposedly told him that 'squeezing' the company on a ticketing deal would just result in Live Nation making up the difference by bumping up their concert rates. 'He made it very clear that those things were intertwined,' Abbamondi said."

167.    Alterra acts as "*the managing partner, if you will*," of Aspenware. Aspenware "get[s] a lot of benefits and shared services from" Alterra, "which has really allowed [it] to level up in a lot of ways."

168.    Aspenware allows ski resorts to track granular information about operations and customers and to sell Destination Ski Package products and services in advance at the same time. Aspenware maintains each guest's order history, which provides opportunities for, among other things, cross-selling and upselling.

169.    In describing the Aspenware platform's "real value" to clients, Clark noted:

> We solve all of the heavy lifting, hard problems behind the scenes. The integrations to the fulfillment systems underneath, the actual system that prints the ticket and validates that it works when you go to the gate, we sell the ticket and send it to that underlying system, and we handle those integrations. We handle the payments. We handle the authentication of the customer. We handle the booking experiences and how you develop those booking experiences. It's good to have a company that eats, sleeps, and breathes thinking about technology to solve that for you. That's really the real value we offer.

170.    In performing this "heavy lifting" and solving these "hard problems behind the scenes," Aspenware accesses and stores each clients' current business data. As Clark put it, "[w]e have access to all the Jackson Hole data, all the Telluride data, all that stuff we work with," and "we maintain all of that stuff internally."

171.    Aspenware later partnered with technology consulting firm 8th Light to build a large language model pipeline and AI data engine ("LLM") to transform the disparate and inconsistent data from each of its ski resort clients "into *standardized, human-readable product intelligence across all partner resorts*."

172.    Before the LLM's roll-out, each ski resort client encoded ticket and other sales data differently. Aspenware's goal in building the LLM was "to turn variable product metadata into a unified, enriched format" and "shared schema," thereby "***making it easier to understand and laying the groundwork for new pricing optimizations***." This capability, in turn, could be used to power real-time dynamic pricing logic and performance analytics.

173.    To standardize the varied data taxonomies then employed across its numerous Destination Ski Resort clients to run its analytics and pricing engine more efficiently, Aspenware, with 8th Light's help, trained the LLM with the clients' unstructured, and confidential, data, including for lift tickets, equipment rentals, and lessons.

174.    Indeed, by transforming this "unstructured data into standardized, human-readable product intelligence across all partner resorts," 8th Light noted, the LLM enabled Aspenware to improve the "pricing engine capabilities, real-time analytics, and downstream automation" necessary for its ski resort clients to achieve "new pricing optimizations" and generate meaningful "***uplift***" in "***ticket product revenue***."

175.    Addressing "[e]xpected results," 8th Light noted, "[t]his project enables the calculation at scale of meaningful optimizations which are known to have positive commercial potential when deployed as merchandising tactics. Per-day pricing is one example of such attributes." The firm reported that "***we expect ~+3% uplift in ticket product revenue***" "[s]ystem-wide" and "***~+3-5% uplift (with higher upside possible, up to +10%)***" for "[r]eturn users."

176.    No later than the 2024/25 ski season, Aspenware began deploying this LLM in its Aspenware Commerce platform and Dynamic Pricing module (discussed further below) for the use and benefit of its ski resort clients like Ikon Pass Resort Defendants.

177.    For Aspenware to access and run their data on its Commerce platform, the Ikon Pass Defendants had to use the same proscribed categories and formatting for their respective internal business data, including those concerning pricing and inventory. In other words, Aspenware's AI model transforms each mountain's distinct data into a standardized format that makes it easier to share and compare across mountains and allows mountains to provide RRC with readily comparable data for analysis.

178.    While Vail did not use Aspenware, it knew that its fellow Resort Defendants were doing so. And it was participating in the same information exchange enabled by NSAA and RRC as these Resort Defendants. Vail thus consciously benefitted from the data standardization resulting from these Resort Defendants' collective use of the Aspenware platform like the Ikon Pass Resort Defendants.

179.    Accordingly, the Aspenware-fostered data standardization across the Ikon Pass Resort Defendants has made Defendants' information exchange more efficient and effective.

180.    Ikon Pass Resort Defendants' collective use of the Aspenware platform's dynamic pricing module furthered Defendants' price-fixing conspiracy by giving them the ability and tools to use the same dynamic pricing strategy and features to set prices for their respective customers.

181.    In September 2022, Aspenware published a piece on its website promoting its Commerce platform's Dynamic Pricing module. The piece stated, in relevant part, the following:

- Dynamic Pricing. It's no secret that *dynamic pricing is a proven strategy to maximize revenue*. It offers the ability for resorts to nimbly respond to market trends, customer demand and behavior, and even the weather! It enables resorts to increase yield and capitalize on revenue opportunities…. *Aspenware's robust*

> ***Dynamic Pricing module enables resorts to dynamically price for various scenarios including:***
> - ***Weekend and weekday rates***
> - ***Peak and off-peak prices***
> - ***Early or late season rates***
> - ***Favorable/unfavorable weather predictions***

- Encourage Pre-commitment. Encouraging resort guests to commit early has ***numerous obvious benefits from higher yield to capacity planning*** and weatherproofing your business…. ***One feature in Aspenware's Dynamic Pricing module that enables precommitment is to vary pricing by how many days in advance the lift ticket is purchased.***

- Communicate Scarcity…. With many resorts considering limiting capacity, the ability to grab a lift ticket can be challenging, especially on a higher-demand day. With Aspenware's pricing module, inventory banners can be placed on the calendar to let guests know how many tickets are left for a particular day, or, with our enhanced pricing calendar, it can be configured to show more general levels of availability such as 'Sold Out,' 'Low' or 'Plenty.'

- Tiered Pricing. Speaking of scarcity, ***Aspenware also offers the ability to leverage demand-driven pricing with our pricing tiers feature. As tickets sell through, the price automatically rises when rolling to a new, high-priced tier.*** An optional banner across the date on the calendar indicates how many tickets are left in that pricing tier to encourage guests to 'Buy Now!'

182.    Several months later in 2022, Clark discussed the Dynamic Pricing module of

Aspenware Commerce platform. Calling dynamic pricing "a key sales tool," he said:

> Dynamic pricing, it just seems complicated, it seems like it's going to be a lot of work to implement it. But again, ***there's companies like Aspenware and others that have a simple model where you can kind of plug that in and the prices all change automatically on the back end.… It's really easy to implement*** if folks just give it a try.

183.    Aspenware Commerce's Dynamic Pricing module quickly gained traction across

a significant proportion of Destination Ski Resorts, including most Resort Defendants and their

individual ski resorts. Indeed, the NSAA 2023/24 Kottke Report released in July 2024 recognized that "more areas" were "moving to dynamic pricing models."

184.   In an April 2025 release on its website, Aspenware touted new capabilities for its Dynamic Pricing module, including the "supercharged add-ons" of "dynamic pricing and inventory control" for "add-ons," including lift tickets, lessons, and equipment rentals, "that are smarter, more flexible, and more profitable" and would give "resorts new levers to drive revenue." "Dynamic Pricing for Add-Ons" would "Automatically adjust pricing for add-ons based on: Seasonality; Booking window; Day of the week; Tiered or custom pricing strategies." Regarding "Inventory Support for Add-Ons," "Rentals, lessons, and other inventory-limited products can now be offered as add-ons with real-time availability." The top reason Aspenware gave for "Why It Matters" was "***Smarter Revenue Management***."

185.   On its website under the heading "***Maximize revenue***," Aspenware tells potential clients to "***Increase yield and bring your strategy to life with our dynamic pricing feature***:"



186.   The Ikon Pass Resort Defendants have used the Aspenware Commerce platform and its Dynamic Pricing module to deploy dynamic pricing strategies for daily lift tickets and other Destination Ski Package products during the Class Period.

187.    The lift ticket pages of Alterra's Destination Ski Resorts, such as Winter Park, Steamboat, Mammoth, and Deer Valley, employ advance-purchase, date-specific lift-ticket pricing, with limited availability and higher prices closer to the ski date. Similarly, Boyne's Boyne Mountain Resort lift ticket page, for example, states that its rates "[v]ary by day and demand," while telling customers to "[b]uy early to secure" the "best pricing for your chosen days on the slopes." And Powdr-run resorts like Mt. Bachelor communicate that daily lift ticket prices are subject to dynamic pricing, with its ticket page noting that "[t]he earlier you buy, the more you can save."

188.    This makes perfect sense. These Resort Defendants also are "partners" who closely collaborate with each other on the marketing and sale of the Ikon Pass and thus have every incentive to work together on pricing strategy for daily lift tickets as well.

### 4. *Defendants Discuss Pricing and Other Business Topics at NSAA Meetings.*

189.    Defendants' senior leaders directly communicated about Destination Ski Package pricing, revenue, costs, and supply, among other business subjects, at NSAA events and meetings immediately before and during the Class Period.

190.    The 2019 National Tradeshow and Convention, held in San Diego, California from late April to early May 2019, featured a State of the Industry panel that included Pat Campbell from Vail and Rusty Gregory from Alterra. During the panel, "they discussed ***multi-area passes***, ***the high cost of same-day ticket purchases***, staffing challenges, and a range of other hot topics."

191.    The 2022 NSAA National Convention and Tradeshow was held in May in Nashville, Tennessee. Ski Area Management Magazine noted "[t]he highly-anticipated final

56

general session on Saturday" featuring Vail CEO Kirsten Lynch and her predecessor Rob Katz. Katz "addressed the elephant in the room: The well-documented issues of crowding at Vail properties and *the discounted Epic Pass*." "*Capacity management* was another hot topic in conversations around the halls and in sessions throughout the show," the magazine added.

192.    The 2023 NSAA National Convention and Tradeshow occurred in May in Savannah, Georgia. According to Ski Area Management Magazine, "[t]he larger general sessions featured panels with representatives from the industry's big players sitting side-by-side[.]" The panel on "Leveraging Technology to Enhance the Modern Guest Experience" featured Boyne President and CEO Stephen Kircher, Vail Western Region SVP and COO Doug Pierini, and Alterra CEO Jared Smith, with Aspenware CEO Rob Clark moderating. When "[t]he conversation turned to *pricing and growth*," Smith commented on "*the rising price of day tickets*." The participants then discussed "*each company's strategy [for] season passes*, with *Kircher advising the audience to not oversell season passes because it limits how you can control capacity* and the experience." Pierini "said *Vail Resorts* is not going to stop selling season passes because it's part of the company's strategy, but it *does limit day ticket sales on certain days at certain properties to address the capacity and experience issues*."

193.    The 2024 NSAA National Convention and Tradeshow happened in May in Frisco, Texas. Per Ski Area Management Magazine, "[m]any of the industry's biggest challenges and opportunities were discussed, both formally and informally[.]" "Unsurprisingly, a common thread throughout the event was *the U.S. ski industry's collaborative culture, where competitors are also resources for one another*." To this point, "[e]ducational sessions laid bare the existing spirit of collaboration. Panels comprised of *leaders from different ski areas and ownership*

57

*companies shared useful insights* on topics" including "*growth*" and "*capacity*." The event also featured "a session led by data research firm RRC Associates," detailing responding ski areas' "strong revenue" and "capital expenditures" by category and amount in 2023/24 and *projected capital expenditures by category and amount for 2024/25*. RRC Research Director Lucy Harbor also led two "sessions to talk ski data," including a "[s]ession with big attendance" titled "Forecasting Futures: Leveraging Insights from the Kottke and Guest Experience Reports" in which she would "*present preliminary results from this year's Kottke End of Season Study*[.]" Before these presentations, she thanked the "US ski areas that have contributed data about your 23/24 ski season, and my team at RRC for turning around results in a matter of days."

194. The 2026 Western Winter Conference and Tradeshow was held in January at Snowbird, Utah. During a presentation by RRC Research Manager Sarah Levin, attendees were shown a chart displaying the "*percent of ticket/pass revenue by ticket category*" from "2019/20 to 2024/25," with the headline "*Season passes now generate the majority of lift revenue*:"



These attendees also viewed a chart conveying "average summary financial data" from "2015/16 – 2024/25" that bore the headline "Cost pressures eased in 2024/25," and a chart listing specific

"Expenses as a Percent of Annual Revenue" for "2024/25." This RRC employee also presented at the 2026 Eastern Winter Conference and Tradeshow in February at Killington, Vermont.

195.    The 2026 NSAA National Convention and Tradeshow occurred in May in Carlsbad, California. As usual, Ski Area Management Magazine reported on the event's highlights. A panel discussion featuring Vail CEO Rob Katz, Boyne CEO Stephen Kircher, and Alterra President and COO Eric Resnick "touched on," among other topics, "***consolidation***" and "***season pass strategy***."

### E.  The Destination Ski Resort Market Possesses Characteristics That Make It Susceptible to Effective Collusion.

196.    The relevant market possesses characteristics that, when considered with the Resort Defendants' participation in an unlawful information exchange, render the market susceptible to collusion and thus make the formation, maintenance, and efficacy of a cartel more likely.

197.    Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, which are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. The Destination Ski Resort market is characterized by at least the following "plus factors:" (i) high barriers to entry; (ii) highly concentrated industry; (iii) motive to conspire; (iv) actions against interest; and (v) opportunities to collude.

#### 1.  *The Destination Ski Resort market has high barriers to entry.*

198.    The economics literature recognizes that markets are more susceptible to collusion where there are barriers to entry. As Vail reported in its 2025 Annual Report: "There is limited opportunity for development of new Destination Ski Resorts due to the limited private lands on which ski areas can be built, the difficulty in obtaining the appropriate governmental

approvals to build on public lands and the significant capital needed to construct the necessary infrastructure. As such, there have been virtually no new Destination Ski Resorts of scale in North America for nearly 45 years, which has allowed and should continue to allow the best-positioned destination resorts to benefit from future industry growth." Thus, the Destination Ski Resort market has extremely high barriers to entry. In addition, the Resort Defendants have acquired many of the Regional Ski Areas that could, with significant investment, conceivably develop into Destination Ski Resorts.

### 2.    *The Destination Ski Resort market is highly concentrated.*

199.    Combined, Vail and Alterra own all of the top 10 Destination Ski Resorts in the United States. The Resort Defendants overall own 27 of the 32 Destination Ski Resorts. These statistics suggest a highly concentrated market.

200.    Markets in which a relatively small number of firms provide a relevant good or service are more conducive to effective collusion. This is because forming, maintaining, enforcing, and concealing a common anticompetitive scheme is easier with few firms involved.

### 3.    *Demand for Destination Ski Resorts is inelastic.*

201.    Few reasonable substitutes are available to consumers in the Destination Ski Resort market. This makes the demand for Destination Ski Resorts relatively inelastic and the consumers' ability to escape the effects of an anticompetitive conspiracy in such markets more difficult than otherwise.

202.    Inelastic demand means that when the price for a product or service increases, consumers' buying habits stay about the same, and when the price for a product or service decreases, consumers' buying habits also remain relatively unchanged.

203.    Downhill skiing differs from all other winter recreational activities, such as cross-country skiing, ice skating, sleigh rides, tobogganing, and taking cruises to places with hot climates. A small but significant and nontransitory increase in prices for skiing would not cause a significant number of downhill skiers to substitute other products for skiing.

204.    While there are destination mountains in Canada, Europe, South America, and Asia, traveling to those countries introduces complications that decrease their substitutability for U.S. Destination Ski Resorts. Travel abroad requires a passport and often a visa for each member of the party. It often involves longer travel and time changes that make it less desirable than a U.S. ski vacation.[9]

### 4.    Defendants acted against their independent self-interests.

205.    By sharing confidential information for competing resorts to use in setting prices and making other business decisions, Resort Defendants took actions that would have been against their individual economic self-interests in the absence of coordination.

206.    If a given Destination Ski Resort shares its confidential business data in a manner resulting in its competitors gaining access to its data, but its competitors do not do the same, then only the competitors would benefit from the asymmetrical information sharing by exploiting that Destination Ski Resort's information to set their own prices and business strategies. Therefore, the Destination Ski Resort has no incentive to share such information unless it knows that it similarly will benefit from other resorts sharing the same information that it also will be able to access and utilize.

---

[9] Even if, for the sake of argument, one considered Canada to be an economically reasonable option for skiers, the Resort Defendants dominate Canadian resorts as well.

207.    By publicizing the list of participants and clients, NSAA and RRC mitigate the risk of information sharing. Resort Defendants know which of their competitors are participating which makes them each more likely to agree to participate in the future.

### 5.  *Defendants had numerous opportunities to collude.*

208.    Communication is a central part of the operation of a cartel. As detailed above, Resort Defendants had ample opportunities to implement, maintain, and enforce their anticompetitive scheme during the Class Period.

209.    Industry organizations like NSAA provided ample opportunity for Defendants' executives, managers, and other relevant personnel to meet and discuss pricing, revenue, costs, supply, and other sensitive business subjects. In addition, as described above, Resort Defendants communicate in furtherance of their agreement to collaborate rather than compete on issues related to climate change and through exchanges of confidential and/or proprietary information.

### F.  Lack of Procompetitive Justification and Existence of Less Restrictive Alternatives for Information Sharing.

210.    Defendants cannot justify their sharing as reasonably necessary to achieve cognizable efficiencies that outweigh the competitive harm. Any legitimate information sharing related to skier safety, environmental concerns, or pandemic-related precautions does not require sharing discrete financial, revenue, and cost data through benchmarking reports or consulting services.

### G.  Defendants' Conduct Substantially Reduced Competition and Harmed Consumers.

### 1. *Defendants' coordinated conduct raised prices, lowered output, and decreased quality.*

211.    The Department of Justice has said that "when competitors agree to exchange competitively sensitive information only among each other, it suggests that the information sharing will benefit only the competitors at the expense of consumers, workers, or other market participants."

212.    In fact, the information sharing practices, enhanced through paid consultancies with RRC and the other forms of coordinated behavior discussed herein, had the purpose and effect of raising the price of Destination Ski Packages in the United States.

213.    The starting price for the multi-mountain passes used at all the Destination Ski Resorts has increased significantly over the Class Period. The Ikon and Ikon Base passes have increased over *45%* during that period, with the Ikon Pass averaging a 6.7% increase per season and the Ikon Base Pass averaging a 5.8% increase per season. Since Vail's reset of pricing in the 2021/22 ski season, it has increased its pass prices by just under *40%*, with both the Epic and Epic Local passes averaging a 6.4% increase per season. These steep increases are shown below:

| MULTIMOUNTAIN PASSES | Epic | Epic Local | Ikon | Ikon Base |
|---|---|---|---|---|
| 19/20 Start | $939 | $699 | $949 | $649 |
| 20/21 Start | $979 | $729 | $999 | $699 |
| 21/22 Start | $783 | $583 | $999 | $729 |
| 22/23 Start | $841 | $626 | $1,079 | $769 |
| 23/24 Start | $909 | $676 | $1,159 | $829 |
| 24/25 Start | $982 | $731 | $1,249 | $869 |
| 25/26 Start | $1,051 | $783 | $1,329 | $909 |

| | | | | |
|---|---|---|---|---|
| **26/27 Start** | $1,089 | $809 | $1,399 | $949 |

214.    As the charts below demonstrate, other than the anomaly of the pandemic year, the price increases for the Ikon and Epic passes are remarkably similar.



| Epic avg (ex-pandemic) | Epic Local avg | Ikon avg | Ikon Base avg |
|---|---|---|---|
| **+6.4%** | **+6.4%** | **+6.7%** | **+5.8%** |
| per season avg | per season avg | per season avg | per season avg |

| Season transition ↑ | Epic ↕ | Epic Local ↕ | Ikon ↕ | Ikon Base ↕ |
|---|---|---|---|---|
| 19/20 → 20/21 | +4.3% | +4.3% | +5.3% | +7.7% |
| 20/21 → 21/22  pandemic | -20.0% | -20.0% | 0.0% | +4.3% |
| 21/22 → 22/23 | +7.4% | +7.4% | +8.0% | +5.5% |
| 22/23 → 23/24 | +8.1% | +8.0% | +7.4% | +7.8% |
| 23/24 → 24/25 | +8.0% | +8.1% | +7.8% | +4.8% |
| 24/25 → 25/26 | +7.0% | +7.1% | +6.4% | +4.6% |
| 25/26 → 26/27 | +3.6% | +3.3% | +5.3% | +4.4% |

215.    Prices for the multi-mountain passes are announced in late February or early March with sales starting the first week in March. In 2026, Vail announced the price of the Epic Pass on March 3 with passes available for purchase that day. Alterra announced the price of the Ikon Pass on March 5 with the passes available for purchase on March 12.

216.    Sales for these passes close in December before the ski season begins in earnest. Vail increases the prices of Epic Passes throughout the year and generally stops selling all Epic Pass products in the first week of December. Similarly, Ikon Passes increase in price close to the ski season and are no longer for sale after early to mid-December.

217.    As both Vail and Alterra are clients of RRC Associates, RRC has insight into each of the companies to advise on setting the initial price of the multi-mountain passes and any price increases.

218.    In addition to Ikon and Epic Pass price increases, customers have faced exorbitant increases in peak daily lift tickets over the Class Period. Each of the Resort Defendants increased peak day-of prices at their flagship mountain resorts well over 55% over the course of the Class Period. Looking at ticket prices in groups, one can see clear patterns of pricing between the competitor mountains, as shown below:

| Ski Mountain | 2019/20 Daily Tickets | 2020/21 Daily Tickets | 2021/22 Daily Tickets | 2022/23 Daily Ticket | 2023/24 Daily Ticket | 2024/25 Daily Lift Ticket | 2025/26 Daily Lift Tickets |
|---|---|---|---|---|---|---|---|
| Beaver Creek (Vail) | $219 | $229 | $239 | $275 | $299 | $329 | $356 |
| Steamboat (Alterra) | $215 | $225 | $269 | $275 | $289 | $299 | $339 |
| Vail (Vail) | $219 | $229 | $239 | $275 | $299 | $329 | $356 |

| Ski Mountain | 2019/20 Daily Tickets | 2020/21 Daily Tickets | 2021/22 Daily Tickets | 2022/23 Daily Ticket | 2023/24 Daily Ticket | 2024/25 Daily Lift Ticket | 2025/26 Daily Lift Tickets |
|---|---|---|---|---|---|---|---|
| Deer Valley (Alterra) | $209 | $229 | $249 | $259 | $289 | $299 | $329 |
| Park City (Vail) | $209 | $219 | $229 | $269 | $299 | $328 | $351 |
| Big Sky (Boyne) | N/A | $181 | $225 | $239 | $249 | $272 | $285 |
| Breckenridge (Vail) | $199 | $209 | $219 | $255 | $279 | $299 | $321 |
| Copper (Powdr) | $178 | $189 | $219 | N/A | $259 | $264 | $274 |
| Keystone (Vail) | $179 | $189 | $199 | $225 | $269 | $292 | $292 |
| Winter Park (Alterra) | $169 | $175 | $219 | $249 | $259 | $267 | $287 |





| Vail avg +8.6% per season avg | | | | Alterra avg +8.5% per season avg | | | Boyne avg +9.7% per season avg | | Powdr avg +7.0% per season avg | |
|---|---|---|---|---|---|---|---|---|---|---|

| Season ↑ | Bvr Crk ↕ | Vail ↕ | Prk City ↕ | Breck ↕ | Keystone ↕ | Deer Val ↕ | Steamboa ↕ | Wtr Park ↕ | Big Sky ↕ | Copper ↕ |
|---|---|---|---|---|---|---|---|---|---|---|
| 19/20→20/21 | +4.6% | +4.6% | +4.8% | +5.0% | +5.6% | +9.6% | +4.7% | +3.6% | N/A | +6.2% |
| 20/21→21/22 | +4.4% | +4.4% | +4.6% | +4.8% | +5.3% | +8.7% | +19.6% | +25.1% | +24.3% | +15.9% |
| 21/22→22/23 | +15.1% | +15.1% | +17.5% | +16.4% | +13.1% | +4.0% | +2.2% | +13.7% | +6.2% | N/A |
| 22/23→23/24 | +8.7% | +8.7% | +11.2% | +9.4% | +19.6% | +11.6% | +5.1% | +4.0% | +4.2% | N/A |
| 23/24→24/25 | +10.0% | +10.0% | +9.7% | +7.2% | +8.6% | +3.5% | +3.5% | +3.1% | +9.2% | +1.9% |
| 24/25→25/26 | +8.2% | +8.2% | +7.0% | +7.4% | 0.0% | +10.0% | +13.4% | +7.5% | +4.8% | +3.8% |

219.    Alterra's Steamboat is priced closely with Vail's Beaver Creek and Vail Resorts. These resorts generally have the highest peak lift ticket prices in the country. Other than the 2021/22 ski season, where ski resorts were operating with less information after the abbreviated 2019/20 ski season, these resorts keep peak lift ticket prices within a 10% range of one another.

67



220.    In the next group, Alterra's Deer Valley and Vail's Park City are grouped with Boyne's Big Sky. While Big Sky appears to have the cheaper lift ticket in the area, up until the 2024/25 season, visitors had to pay an extra charge to ride the Lone Peak Tram which brought the base ticket price on par with Deer Valley and Park City.



68

221.    Keystone, Copper and Winter Park tend to have pricing grouped together, with Breckenridge priced between these three Destination Ski Resorts and the more premium Steamboat, Beaver Creek and Vail.



222.    Daily lift ticket prices for the Destination Ski Resorts are generally announced in late summer or early fall as RRC compiles data from the Destination Ski Resorts. RRC has access to the economic data related to lift ticket purchases and customer survey data regarding satisfaction from all Destination Ski Resorts as it advises its resort clients on base and peak lift ticket pricing for the next ski season.

223.    The prices announced prior to the start of the ski season may change based on dynamic pricing. For instance, Alterra announced Steamboat's peak price of $309 in July 2025 which climbed to $339 in December 2025.

224.    Between the 2020/21 season and the 2023/24 season, the Destination Ski Resorts saw revenue from lift tickets and passes increase from $52,383,000 on average to $74,966,000 on average in the 2023/24 ski season.

225.    Likewise, the Destination Ski Resorts saw revenue from rental shops increase to $3,277,000 from $2,056,000 on average in the 2020/21 ski season. This increase in revenue largely resulted from an increase in prices during that time period. Rental prices have increased substantially at most of the top Destination Ski Resorts over the Class Period as shown below:

| Ski Mountain | 2019/20 Rentals | 2024/25 Rentals |
|---|---|---|
| Beaver Creek (Vail) | $59 | $83 |
| Steamboat (Alterra) | $65 | $71 |
| Vail (Vail) | $69 | $88 |
| Deer Valley (Alterra) | $54 | $125 |
| Park City (Vail) | $57 | $72 |
| Big Sky (Boyne) | $52 | $84 |
| Breckenridge (Vail) | $65 | $75 |
| Copper (Powdr) | $44 | $65 |
| Keystone (Vail) | $65 | $74 |
| Winter Park (Alterra) | $42 | $75 |
| Mammoth (Alterra) | $34 | $76 |
| Palisades Tahoe (Alterra) | $30 | $78 |

226.    Similarly, revenue from lessons increased from $8,234,000 on average for the Destination Ski Resorts in the 2020/21 ski season compared to $14,871,000 on average in the 2023/24 ski season.

227.    The number of lessons purchased decreased on average over the Class Period. In the 2018-2019 ski season, the largest ski resorts provided almost 32,000 lessons on average over the ski season. Since that time, the average number of lessons booked at the largest resorts has remained below 30,000.

228.    The increase in lesson prices may explain the decrease in bookings. For instance, Mammoth increased its base half-day lessons from $152 in 2019/20 to $325 in 2025/26 while Copper increased its base half-day lessons from $143 in 2019/20 to $229 in 2025/26.

229.    Food and beverage saw the largest increase in revenue during this time from $7,142,000 on average in the 2021/22 ski season to $14,730,000 in the 2023/24 ski season.

230.    Combined with the increased price of lift tickets at these resorts, destination skiers have paid the price to provide the Destination Ski Resorts with outsize profits. The *Denver Gazette* estimated a week-long family ski trip to Breckenridge increased from $10,000 in the 2020/21 ski season to $14,000 in the 2025/26 ski season. Overall, the total revenue per skier visit increased from an average of $126.54 in 2020/21 to $162.00 in 2023/24.

231.    By relying on the shared data from customer surveys and discrete spending categories, the Resort Defendants were able to increase prices for the entire Destination Ski Package. For instance, the total price for a typical Destination Ski Package at Vail, Beaver Creek, Breckenridge, and Steamboat increased by around 50% between the 2019/20 ski season and the 2024/25 ski season. Likewise, a typical Destination Ski Package at Copper, Winter Park, and Keystone increased by over 60% during the same period. With expenses growing at a more modest pace, the Destination Ski Resorts saw profits almost double on average over the course of the Class Period.

232.    Because Resort Defendants no longer compete on the value of the Destination Ski Package, they have systematically reduced the quality of the experience. Overcrowded mountains, depleted rental fleets, and reduced "on-mountain" staffing levels are consistent complaints from skiers and snowboarders. Destination Ski Resort guests commonly report 30- to 60-minute-long lift lines, made worse by frequent operational issues. For example, at Park City Mountain Resort (Vail), skiers have described delayed openings, congested ski trails, and lift stoppages that compound wait times during peak periods. Park City's troubles were exacerbated in December 2024, when their ski patrol, the Park City Professional Ski Patrol Association, went on strike in protest of unfair wages and treatment by Vail. Despite a lack of on-mountain staffing and safety patrollers, Park City attempted to stay open through the strike, leading to extreme crowding and extended waits for holiday skiers.

## V.    PLAINTIFFS' CLAIMS ARE TIMELY

### A.  Continuing Violation

233.    During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly harmed Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein.

234.    Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts, repeatedly selling Destination Ski Packages at artificially inflated prices, communicating with each other through RRC and at industry events to discuss the terms of and continued adherence to the conspiracy, and continually refusing to compete for each other's customers on price, to ensure sales at artificially inflated rates.

235.     Claims for these antitrust violations accrue each time a victim pays a supracompetitive price and/or suffers some form of financial damage proximately caused by Defendants' antitrust violations. Such claims have accrued with each sale and with each payment of a surcharge imposed by the Defendants. And such claims will continue to accrue until the effects of Defendants' conduct cease to be felt.

### B.  Fraudulent Concealment

236.     Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their horizontal agreement claims. Much of the information cited above was hidden behind several hundred-dollar pay walls that discouraged Plaintiffs and other Class Members from discovery. Thus, Plaintiffs and other Class Members did not and could not have known about Defendants' anticompetitive agreement until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to share confidential information with the purpose to fix, raise, maintain, and stabilize the prices for Destination Ski Packages.

237.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. A reasonable person under the circumstances would not have been alerted to begin to investigate the prices charged by Destination Ski Resorts in the United States.

238.     Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

239.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members. In fact, the Resort Defendants affirmatively disclaimed their conduct.

240.    Vail published a Code of Ethics on its website that contained an "Antitrust and Fair Competition" section. The policy states that under antitrust laws, Vail cannot "[f]ix[] the prices of terms of sale for competing products (e.g. signaling future lift ticket or season pass pricing)." The policy goes on to state, "Certain kinds of information, such as pricing, marketing plans, and bids on Requests for Proposals (RFP) or government contracts (including National Park Service concession contracts), cannot be exchanged or discussed with competitors, no matter how innocent or casual the exchange may be and regardless of the setting, whether business or social. There are no off-the-record discussions with competitors."

241.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VI.    ANTITRUST INJURY AND CLASS ALLEGATIONS

### A. Antitrust Injury

242.    Plaintiffs and Class members have been injured by Defendants' unlawful information sharing in that they paid higher prices for Destination Ski Resort vacations than they would have paid in a competitive market.

243.    This injury includes, among other things, overcharges on Destination Ski Packages which consist of season passes, daily lift tickets, and the ancillary goods and services

like equipment rentals and lessons purchased from a Destination Ski Resort owned by one of the Resort Defendants.

### B. Class Action Allegations

244.    Plaintiffs' injuries are of the type the antitrust laws were intended to prevent and flow directly from Defendants' anticompetitive conduct.

245.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons who purchased Destination Ski Packages directly from any of the Resort Defendants, their subsidiaries, agents, affiliates, or joint ventures from January 1, 2020, and continuing through the present (the "Class Period"), and such persons paid for the Destination Ski Package within the United States. The United States includes all fifty states, its territories and the District of Columbia.

246.    Excluded from the Class are Defendants; their officers, directors, management, employees, parents, subsidiaries, affiliates, and co-conspirators. Also excluded are any judicial officers presiding over this action and their spouses as well as their law clerks and their spouses.

247.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

248.    The Class is so numerous that joinder of all members of the Class in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains thousands of similarly situated customers.

249.    The Class is readily identifiable and is one for which records should exist.

250.    Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

251.    Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in value for Destination Ski Packages than they would have in a competitive market.

252.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Class.

253.    Questions of law and fact common to Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

254.    Questions of law and fact common to the Class include:

- Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Destination Ski Packages;

- Whether Defendants engaged in an agreement, combination, or conspiracy to exchange confidential information for the purpose of fixing, inflating, maintaining or stabilizing the prices paid for Destination Ski Packages;

- Whether such agreements constituted violations of the Sherman Antitrust Act;

- The identity of the participants of the alleged conspiracy;

- The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

- Whether Defendants fraudulently concealed their misconduct;

- Whether and to what extent Defendants' anticompetitive scheme inflated prices of Destination Ski Packages above competitive levels;

- The nature and scope of injunctive relief necessary to restore competition; and

- The measure of damages suffered by Plaintiffs and the Class.

255. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

256. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

257. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## COUNT I

### VIOLATION OF THE SHERMAN ACT

**Conspiracy to Restrain Trade**
**In Violation of § 1 and 3 of the Sherman Act (15 U.S.C. § 1 and 3)**

258.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

259.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2020 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown and exclusively within the knowledge of Defendants, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1 and 3) by artificially reducing or eliminating competition for the pricing of Destination Ski Packages directly sold to United States purchasers.

260.    In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of Destination Ski Packages sold to United States purchasers during the Class Period.

261.    Among other things, to implement their conspiracy, the Resort Defendants shared confidential information through the NSAA and RRC and then hired RRC to use that confidential information in guiding the Resort Defendants' pricing policies and other operational decisions.

262.    This conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 3.

263.    Plaintiffs and members of the Class directly purchased Destination Ski Packages at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

78

264.    Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

265.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

266.    Plaintiffs and members of the Class are entitled to recover damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### UNLAWFUL INFORMATION EXCHANGE

**Conspiracy to Restrain Trade
In Violation of § 1 and 3 of the Sherman Act (15 U.S.C. § 1 and 3)**

267.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

268.    For purposes of this Count, which is based upon a claim subject to the Rule of Reason analysis, the relevant geographic market is the United States, and the relevant product market is Destination Ski Packages. The Resort Defendants have at a minimum a collective 81% of the Destination Ski Resort market and thus possess market power within it.

269.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2020, and continuing through the present, Defendants agreed with each other to exchange competitively sensitive, non-public information regarding various revenue streams, operational costs, visitor demographics, lift ticket metrics, and other information necessary to

raise, fix, maintain, or stabilize the prices for Destination Ski Packages in the United States to or at supracompetitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Destination Ski Package market in the United States to or at supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3).

270.    Pursuant to the agreement, Resort Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to artificially raise, fix, maintain, or stabilize prices of Destination Ski Packages sold in the United States to Plaintiffs and Class Members to or at supracompetitive levels.

271.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, the Defendants' objectives could have been reasonably achieved through other means.

272.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a.  Price competition in the sale of Destination Ski Packages has been restrained, suppressed, and/or eliminated in the United States;

b.  Prices for Destination Ski Packages sold by the Resort Defendants have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States; and

c.  Plaintiffs and the Class Members have been deprived of the benefits of free and open competition.

273.    Plaintiffs and Class Members have been injured and will continue to be injured in their business or property by paying more for Destination Ski Packages purchased from the Resort Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

274.    Plaintiffs and the Class Members are threatened with future injury to their business and property by reason of Defendants' continuing violations of Sections 1 and 3 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

275.    Plaintiffs and the Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that:

276.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

277.    The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed an unlawful combination, trust, agreement, understanding and/or concert of action in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

278.    Plaintiffs and members of the Class recover damages including umbrella damages as appropriate, to the maximum extent allowed under such laws, and that a joint and several

judgment in favor of Plaintiffs and members of the Class be entered against Defendants in an amount to be trebled as law permits;

279.    Plaintiffs and members of the Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

280.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

281.    Plaintiffs and Class Members be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

282.    Plaintiffs and Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

283.    All appropriate injunctive relief is entered against Defendants to prohibit Defendants from continuing to engage in their unlawful conduct or in any similar and related conduct in the future, deprive Defendants of the fruits of their illegal conduct, and remedy the harms to competition and consumers caused by Defendants' conduct, including, without

limitation, an order that Defendants divest sufficient assets to restore the competition that existed in the relevant product and geographic markets prior to Defendants' unlawful acquisitions;

284.    Permanently enjoining Defendants pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 (a) and 26, from continuing their unlawful conduct;

285.    Plaintiffs and Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

286.    Plaintiffs and Class Members have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: August 5, 2026                          Respectfully submitted,

/s/ Ellen G. Jalkut
Ellen G. Jalkut
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
Telephone: (212) 980-7400
ejalkut@robinskaplan.com

Stacey P. Slaughter
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
sslaughter@robinskaplan.com

*/s/ James R. Martin*
James R. Martin
Jennifer D. Hackett
Sabrina A. Nelson
Noah Wolfenstein
Desmond Sims
**ZELLE LLP**
1775 Pennsylvania Avenue, NW, Suite 375
Washington, DC 20006
Telephone: (202) 899-4100
Facsimile: (612) 336-9100
jmartin@zellelaw.com
jhackett@zellelaw.com
snelson@zellelaw.com
nwolfenstein@zellelaw.com
dsims@zellelaw.com

*/s/ Christopher J. Cormier*
Christopher J. Cormier
ccormier@burnscharest.com
Ian Ulysse Baize
ibaize@burnscharest.com
**BURNS CHAREST, LLP**
2445 M Street NW Suite #740
Washington, DC 20037
Telephone: (202) 577-3977

Warren T. Burns*
wburns@burnscharest.com
Lawson Sadler*
lsadler@burnscharest.com
Ariana Noshari*
anoshari@burnscharest.com
**BURNS CHAREST, LLP**
901 Main Street, Suite # 5800
Dallas, TX 75202
Telephone: (469) 904-4550

*Attorneys for Plaintiffs and Proposed Class*
*Application for admission forthcoming

84