**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:26-cv-03555-RMR-SBP

NICHOLAS GREEN, JAMES "SCOTT" DOUGLAS, and JOSEPH GOAD on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

VAIL RESORTS, INC.; ALTERRA MOUNTAIN COMPANY; BOYNE USA, INC. d/b/a BOYNE RESORTS; POWDR CORP.; RRC ASSOCIATES, INC.; and NATIONAL SKI AREAS ASSOCIATION,

Defendants.

---

**DEFENDANTS' OMNIBUS MOTION TO DISMISS**

---

# TABLE OF CONTENTS


Introduction ........ 1

Plaintiffs' Allegations ........ 2

Legal Standard ........ 5

Argument ........ 6

A. Plaintiffs do not plausibly allege agreements sufficient to support either of their Sherman Act claims ........ 6

1) Plaintiffs do not plausibly allege an agreement among Resort Defendants to fix prices (Count I) ........ 7

2) Plaintiffs do not allege "plus factors" sufficient to infer the existence of an agreement among Resort Defendants to share information (Count II) ........ 17

B. Plaintiffs do not sufficiently plead that an agreement to exchange information through a vendor caused anticompetitive effects in a relevant market ........ 17

1) Plaintiffs fail to adequately plead a relevant product market in which an anticompetitive effect occurred ........ 18

2) Plaintiffs do not plead facts showing that any information exchange caused anticompetitive effects ........ 21

3) Plaintiffs' survey-and-benchmarking allegations do not suggest an anticompetitive effect ........ 22

4) Plaintiffs plead only hypotheticals, not actual facts, in support of an information exchange through RRC and NSAA ........ 24

Conclusion ........ 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*1-800 Contacts, Inc. v. FTC*,
1 F.4th 102 (2d Cir. 2021) ........ 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 5, 17

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025) ........ 8, 14, 18, 22

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
22-cv-02363, 2023 WL 7277313 (D. Colo. Sept. 29, 2023) ........ 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ *passim*

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ........ 21

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*,
691 F. App'x 515 (10th Cir. 2017) ........ 5, 9, 22

*Brooklyn Downtown Hotel LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO*,
No. 15 CIV. 1578 (PAC), 2017 WL 1192179 (S.D.N.Y. Mar. 29, 2017) ........ 20

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........ 18, 20

*Brown v. JBS USA Food Co.*,
773 F. Supp. 3d 1193 (D. Colo. 2025) ........ 12, 23

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017) ........ 20, 21

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) ........ 8

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999) ........ 18

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ........ 10, 11

*Cornish-Adebiyi v. Caesars Ent. Inc.*,
184 F.4th 172 (3d Cir. 2026) .......... 14

*Coronavirus Rep. v. Apple Inc.*,
No. 21-CV-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .......... 19, 20

*Dai v. SAS Inst. Inc.*,
No. 24-CV-02537-JSW, 2025 WL 2078835 (N.D. Cal. July 18, 2025) .......... 14

*Dorrell v. Constellation Energy Corp.*,
No. 25-CV-2251-ABA, 2026 WL 2249275 (D. Md. Aug. 5, 2026) .......... 8

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) .......... 18

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) .......... 13, 14, 15, 16, 21

*Gibson v. Cendyn Grp., LLC*,
No. 2:23-CV-00140-MMD-DJA, 2024 WL 2060260 (D. Nev. May 8, 2024) .......... 13, 15

*Gibson v. MGM Resorts Int'l*,
No. 2:23-CV-00140-MMD-DJA, 2023 WL 7025996 (D. Nev. Oct. 24, 2023) .......... 15

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
371 F.3d 1275 (10th Cir. 2004) .......... 19

*Gregory v. Fort Bridger Rendezvous Ass'n*,
448 F.3d 1195 (10th Cir. 2006) .......... 6

*Hogan v. Pilgrim's Pride Corp.*,
No. 16–CV–02611–RBJ, 2018 WL 1316979 (D. Colo. Mar. 14, 2018) .......... 8

*Homie Tech., Inc. v. Nat'l Ass'n of Realtors*,
186 F.4th 763 (10th Cir. 2026) .......... 5, 24

*Huntsman v. Liberty Mut. Auto & Home Servs. LLC*,
No. 24-CV-01637-GPG-KAS, 2025 WL 2405953 (D. Colo. Aug. 19, 2025) .......... 9, 13

*In re Broiler Chicken Antitrust Litig.*,
702 F. Supp. 3d 635 (N.D. Ill. 2023) .......... 24

*In re Concrete & Cement Additives Antitrust Litig.*,
No. 24-MD-3097 (LJL), 2025 WL 1755193 (S.D.N.Y. June 25, 2025) .......... 8, 9, 10

*In re Loc. TV Advert. Antitrust Litig.*,
No. 18 C 6785, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .................................... 17

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015)........................................................................... 16

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009)............................................................................ 14

*Law v. NCAA*,
134 F.3d 1010 (10th Cir. 1998)......................................................................... 18

*Llacua v. W. Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019)............................................................ 6, 11, 16, 17

*Md. & Va. Milk Producers Ass'n v. United States*,
362 U.S. 458 (1960)............................................................................................. 5

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)........................................................................................ 6, 18

*PhantomALERT Inc. v. Apple Inc.*,
183 F.4th 790 (D.C. Cir. 2026)........................................................................... 20

*Rozema v. Marshfield Clinic*,
977 F. Supp. 1362 (W.D. Wis. 1997) ................................................................. 19

*Segal v. Amadeus IT Grp., S.A.*,
24-cv-1783, 2026 WL 879583 (N.D. Ill. Mar. 31, 2026)................................ 12, 17, 23

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006)................................................................................................ 6

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)......................................................................... 17, 18, 23

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978).................................................................................. 6, 11, 18

*VDARE Found. v. City of Colorado Springs*,
11 F.4th 1151 (10th Cir. 2021) ............................................................................ 5

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
796 F.2d 1216 (10th Cir. 1986)........................................................................... 19

**Statutes**

15 U.S.C. § 1 ........................................................................................................ *passim*

15 U.S.C. § 3 ........................................................................................................ 2

Defendants Vail Resorts, Inc. ("Vail Resorts"), Alterra Mountain Company ("Alterra"), Boyne USA, Inc. ("Boyne"), Powdr Corp. ("Powdr"), RRC Associates, Inc. ("RRC"), and National Ski Areas Association ("NSAA") move to dismiss Plaintiffs' Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants conferred with Plaintiffs by email on October 21 and 22, 2026, regarding the grounds in this motion; Plaintiffs oppose dismissal. Civ. Pr. Std. 7.1B(b).

## INTRODUCTION

Ski resort operators compete vigorously to attract guests to their mountains. In doing so, each must respond to industry-wide pressures that the Complaint itself describes: pandemic disruptions, staffing challenges, rising costs, climate-related investment, and demand that strains mountain capacity. To do so, they make substantial investments to modernize resort infrastructure and expand lift access with new pass products, new pricing strategies, and new ways to deal with the challenges of climate change. These are the hallmarks of competition. Yet Plaintiffs recast this competition as conspiracies among Vail Resorts, Alterra, Boyne, and Powdr (the "Resort Defendants") to fix the price of "Destination Ski Packages" and exchange information. Plaintiffs' allegations do not withstand scrutiny.

First, both Counts I and II fail because Plaintiffs do not plausibly allege that Resort Defendants agreed to fix prices or exchange competitively sensitive information. Plaintiffs devote dozens of pages to trade association participation (NSAA), industry conferences, surveys, common software, and consulting relationships (RRC), but those allegations show typical use of industry resources, not *agreement* among Resort Defendants. And

on critical points, Plaintiffs plead possibilities rather than facts: for example, they allege that RRC, an industry consultant, “could” have shared one Resort Defendant’s resort-level data with another, not that it ever did so. Indeed, Plaintiffs’ principal support for their information-sharing theory is confidentiality provisions expressly designed to prevent such sharing. Separate dealings with a third party are not an agreement among competitors, and without an agreement, there is no antitrust claim.

Nor do Plaintiffs’ pricing allegations suggest agreement. No Resort Defendant offers, markets, or sells a “Destination Ski Package.” Plaintiffs use the term to group distinct products and services—including lift access, equipment rentals, lessons, and food and beverage—that guests buy in different combinations, and then allege that Defendants fixed the price of this bundle. Plaintiffs’ own allegations show that prices for the components of that supposed bundle moved by different amounts at different times during the same seven-year period. In 2021, for example, Vail Resorts cut its season-pass price by 20% while Alterra held its price flat or raised it. That alleges competition, not a cartel.

Second, Count II fails for the additional reason that Plaintiffs plead no anticompetitive effect in any plausible relevant market. Plaintiffs’ own allegations describe each Resort Defendant acting independently—both in sharing survey data with NSAA and RRC, and in setting its own prices. That is the opposite of a conspiracy, and Plaintiffs’ Complaint should be dismissed for failure to state a claim.

## PLAINTIFFS’ ALLEGATIONS

Plaintiffs bring two claims under Sections 1 and 3 of the Sherman Act: price fixing (Count I) and information exchange (Count II). Plaintiffs allege that the Resort

Defendants, a non-profit trade association (NSAA), and a market research company (RRC) conspired to fix prices for "Destination Ski Packages"—defined to include "multi-mountain season passes, daily lift tickets, equipment rentals, lessons, and ancillary goods and services"—at 32 U.S. "Destination Ski Resorts." Compl. ¶¶ 2, 38, 81, 260.

Plaintiffs do not allege that any Resort Defendant offered this bundle to any consumer, or charged a price for it. Instead, they allege that prices for individual elements of the bundle changed by different amounts for the different Resort Defendants.

In Count II, Plaintiffs allege that Resort Defendants conspired to exchange information through NSAA and RRC. Compl. ¶¶ 5, 6, 269. Each Resort Defendant allegedly provided NSAA and RRC with operational data, such as "skier visits . . . actual opening and closing dates compared to scheduled opening and closing dates, unscheduled midseason closures, tickets and passes, ticket price/yield/yield ratio, lessons and equipment rentals, summer operations, [and] capital expenditures"—from which NSAA and RRC published the annual Kottke Report and Economic Analysis: aggregated statistics by region and ski area size from past ski seasons. *Id.* ¶¶ 109-12, 120-25. The data in those reports is at least one to four months old. *Id.* ¶¶ 118, 136.

Plaintiffs also point to the reports' "Data Confidentiality" provisions, which state that resort-level data will be "used as part of [a] broader, aggregated data set," that RRC "is the only entity that will have access to ski-area-specific data," and that data that "names or identifies" a ski area "will not be released" without the ski area's "express written authorization and consent." *Id.* ¶¶ 114-15, 132-33. From these provisions, Plaintiffs infer that NSAA and RRC "could" share de-identified resort-level data, *id.* ¶¶ 116, 134, but they

do not allege that NSAA or RRC ever *did* share resort-level data, much less that any Resort Defendant *authorized* them to do so.

Plaintiffs further allege, in conclusory terms, that RRC "necessarily" drew on "institutional knowledge" from this data to advise "major Resort Defendants" on pricing, and that clients "followed" that advice. Compl. ¶¶ 1, 6, 94, 143, 149. Plaintiffs, however, never specify which resorts are "major." And they never allege that Boyne or Powdr had consulting agreements at all. Instead, Plaintiffs state only that RRC publicized a client list that included "resorts owned by Powdr and Boyne," without defining which Boyne or Powdr resorts RRC listed as clients. *Id*. ¶ 152. Moreover, Plaintiffs identify no instance in which RRC used one Resort Defendant's data to advise another resort as to pricing.[1]

Plaintiffs also allege that Alterra, Boyne, and Powdr—but not Vail Resorts—use the same e-commerce platform, Aspenware. Compl. ¶¶ 8, 156. They do not allege that Aspenware shares information among its users or that Resort Defendants agreed to follow any Aspenware pricing recommendation. Plaintiffs allege that each Resort Defendant adjusts its own pricing in response to "demand, inventory, and competitor behavior." *Id.* ¶ 8. Finally, Plaintiffs allege that Defendants' employees commented on historical industry trends at NSAA conventions between 2019 and 2026. *Id.* ¶¶ 9, 189-95.

Taken as a whole, the Complaint describes an industry in which resort operators participate in trade associations, receive *historical, aggregated* benchmarking data, retain

[1] While Plaintiffs' allegations lump RRC and NSAA together with respect to data collection and aggregation, Plaintiffs do not allege that NSAA discussed prices or resort-specific data with any Resort Defendant or that NSAA provided any pricing recommendations or had any role in any RRC consulting engagement.

common consultants and vendors, and independently adjust prices in response to market conditions. The facts alleged are consistent with ordinary competitive behavior and do not plausibly suggest an agreement to fix prices or exchange competitively sensitive information.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he court need not accept conclusory allegations without supporting factual averments[.]" *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021) (internal quotations omitted).

To state a claim under Section 1 of the Sherman Act, a plaintiff must plausibly allege an agreement that unreasonably restrains trade.[2] *Twombly*, 550 U.S. at 553-57; *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 519 (10th Cir. 2017); *Homie Tech., Inc. v. Nat'l Ass'n of Realtors*, 186 F.4th 763, 773 (10th Cir. 2026) ("the crux of a § 1 violation is the agreement"). An agreement may be pleaded through direct evidence, which must be "explicit" and should "require[] no inferences to establish the proposition or conclusion being asserted," or through parallel conduct plus factual circumstances—often called "plus factors"—from which the Court can plausibly

[2] Section 3's restraint-of-trade provision does not impose a substantive standard distinct from Section 1; it applies the same prohibition to the specified District of Columbia and territorial commerce. *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 460 n.2 (1960).

infer that defendants acted pursuant to an agreement rather than independently. *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174 & n.24, 1177 (10th Cir. 2019); *Twombly*, 550 U.S. at 556-57. Circumstantial evidence "just as consistent with unilateral action as with concerted action" is insufficient to support an inference of agreement at the pleading stage. *Llacua*, 930 F.3d at 1179-80 (internal quotations omitted).

Certain agreements, such as agreements among horizontal competitors to fix prices, are prohibited *per se*. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Most other agreements, such as agreements among competitors to exchange information, are evaluated under a rule of reason analysis. *Id.*; *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). The rule of reason requires a plaintiff to plead and prove that the alleged agreement "has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *see also Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006).

## ARGUMENT

Plaintiffs' claims fail because they do not plausibly allege an agreement to restrain trade. Plaintiffs' failure to allege an agreement to fix prices dooms their *per se* claim (Count I). Their failure to allege any agreement to exchange competitively sensitive information, much less one that harmed competition in the alleged antitrust market, requires dismissal of Count II.

### A. Plaintiffs do not plausibly allege agreements sufficient to support either of their Sherman Act claims

Both Counts fail for a simple reason: Plaintiffs do not allege an agreement among

the Resort Defendants. Plaintiffs seemingly plead a "hub-and-spoke" conspiracy.[3] However labeled, the defect is the same: Plaintiffs allege that each Resort Defendant dealt separately with NSAA, RRC, or a software vendor, not that the Resort Defendants agreed *with one another*. Plaintiffs instead reason that because Resort Defendants used some of the same industry resources, attended some of the same meetings, and received some of the same reports, they must have conspired with each other. That inference does not follow. Without that horizontal agreement—the "rim"—a series of separate dealings with a third party does not state a Section 1 conspiracy either to fix prices (Count I) or to share information (Count II).

**1) Plaintiffs do not plausibly allege an agreement among Resort Defendants to fix prices (Count I)**

Plaintiffs allege no direct evidence of an agreement to fix prices of "Destination Ski Packages," and their circumstantial evidence falls short. Plaintiffs fail to allege either parallel pricing conduct or plus factors from which to plausibly infer an agreement. They therefore fail to state a Section 1 claim for Count I. *See Twombly*, 550 U.S. at 556-57.

**a. Plaintiffs do not allege "parallel conduct"**

When Plaintiffs seek to infer an agreement from circumstantial allegations of Defendants' conduct, they must allege conduct that is coordinated or parallel; allegations concerning only unilateral conduct cannot support a plausible inference that Defendants reached an agreement. *Twombly*, 550 U.S. at 556-57; *Ass'n of Surgical Assistants v. Nat'l*

[3] A "hub-and-spoke" conspiracy is where a third-party acts as a "hub" to facilitate the unlawful agreement between the competitors. Critically, such a conspiracy requires a "rim," meaning an agreement *between* the competitors.

*Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 190-91 (10th Cir. 2025) ("*ASA*").

Plaintiffs must allege conduct "sufficiently parallel to support the plausible inference that the defendants entered an agreement to act in consort." *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *13 (S.D.N.Y. June 25, 2025). "Wide variations in the timing, scope, and amount of pricing changes signal competition rather than the lack thereof." *Id.*; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) ("allegations fall far short of demonstrating parallel behavior" where alleged conduct involved "choosing to decline, decrease, and even increase credit . . . at different time periods"); *Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018) (no "parallel conduct" where plaintiffs failed to allege how competitors' production cuts compared to one another); *Dorrell v. Constellation Energy Corp.*, 2026 WL 2249275, at *12 (D. Md. Aug. 5, 2026) (no parallel conduct where "less than one-fourth of the Defendants [had] matching increase rates during less than half of the alleged class period," and the alleged "percentage increases align with average inflation rates"). Plaintiffs' allegations do not clear this bar.

**First**, Plaintiffs cannot allege parallel pricing for a bundle that does not exist. They do not actually allege the price of a "Destination Ski Package" at any Resort Defendant's resort, offering instead vague allegations about the cost of a "family ski trip" and that pricing for "a typical Destination Ski Package" at seven resorts increased over five years. Compl. ¶¶ 230-31. Such imprecision precludes any finding that Resort Defendants' pricing for the alleged bundle moved in concert.

Nor do allegations of average price or revenue increases—at a selectively chosen

sample or averaged across all Defendant mountains—sufficiently plead parallel pricing by the individual Resort Defendants. *See Huntsman v. Liberty Mut. Auto & Home Servs. LLC*, 2025 WL 2405953, at *4-5 (D. Colo. Aug. 19, 2025), *report and recommendation adopted*, 2025 WL 3242394 (D. Colo. Sept. 4, 2025) (dismissing antitrust claims for impermissible group pleading); *Bristow*, 691 F. App'x at 519 (plaintiffs must make clear "exactly who is alleged to have done what to whom").

**Second**, Plaintiffs do not allege parallel pricing for the products that supposedly comprise Destination Ski Packages. They focus instead on the price of lift access—season passes and lift tickets (Compl. ¶¶ 213-14, 218-23)—but even there do not allege that Resort Defendants' prices matched or moved at the same time, by the same amount, by the same percentage, or even in the same direction.

<u>Season Passes</u>: First, Plaintiffs ignore significant variation between the Epic and Ikon Passes. A price-fixing conspiracy in which competitors' prices diverge *during* the alleged conspiracy is implausible. *See In re Concrete*, 2025 WL 1755193, at *13-15. Starting at nearly the same level in 2019/20, Pass prices moved in *opposite* directions in 2021: Alterra held constant its Ikon Pass price and raised its Ikon Base Pass price about 4%, while Vail Resorts cut its Epic Pass and Epic Local Pass prices about 20%. Compl. ¶¶ 213-14. By 2026/27, the passes differed in price by almost 30%, and from 2025/26 to 2026/27, the Epic Pass rose 3.6% while the Ikon Pass rose 5.3%. *Id.* Second, Plaintiffs do not allege that Boyne or Powdr had *any* control over pricing for those Passes. *Id.* ¶¶ 29, 31, 34. The season-pass theory thus reduces to two independent decision-makers—Vail Resorts (Epic) and Alterra (Ikon)—whose divergent pricing cannot support an inference

of a four-way horizontal agreement. *See In re Concrete*, 2025 WL 1755193, at *13-14.

Lift Tickets: Plaintiffs allege peak lift ticket pricing at less than a third of the mountains in their proposed market, including only one mountain each for Boyne and Powdr and none on the East Coast (which accounts for a quarter of the Resort Defendants' "Destination Ski Resorts"). Compl. ¶ 218. Even these figures do not show parallel conduct. Plaintiffs allege that Resort Defendants' peak day-of prices at flagship resorts rose "well over 55%" over seven years, with average annual increases of 7% to 9.7%. *Id.* But such "averages" obscure significant differences among Resort Defendants. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 399-400 (2d Cir. 2024). These averages "hide trends that . . . tell a different story," because Plaintiffs' other allegations show that lift ticket prices differed at each individual mountain. *Id.* at 400. For example, Plaintiffs concede that "Big Sky appears to have the cheaper lift ticket in the area," Compl. ¶ 220, and that from 2024 to 2025, peak lift ticket prices at Keystone (Vail Resorts) did not increase at all while prices at Steamboat (Alterra) rose 13.4%. *Id.* ¶ 218. These admitted differences are the antithesis of parallel conduct.

Equipment Rentals: Plaintiffs allege that from 2019 to 2026, prices for rentals of unspecified equipment rose between 14% and 41% at five Vail Resorts mountains, rose between 9% and 160% at five Alterra mountains, rose 62% at the only included Boyne mountain (Big Sky), and rose 48% at the only included Powdr mountain (Copper). Compl. ¶ 225. Nothing about these divergent increases suggests coordination or agreement.

Lessons: Plaintiffs allege pricing for lessons only in averages and through two selectively chosen examples that do not even cover all Resort Defendants. *Id.* ¶¶ 226-28.

Such group pleading "obscures" any difference among Resort Defendants and cannot establish that they acted in parallel. *Pontiac Police*, 92 F.4th at 399.

Food and Beverages: Plaintiffs allege only that food and beverage *revenues*—presumably across all Resort Defendants—increased between 2021 and 2024. Compl. ¶ 229. They do not allege any Resort Defendant's *prices*, or even that prices have increased at all, much less in parallel.

**b. Plaintiffs do not allege "plus factors" sufficient to infer the existence of an agreement among Resort Defendants to fix prices**

Plaintiffs' "plus factors" are irrelevant absent parallel conduct and, in any event, are "just as consistent with unilateral action as with concerted action." *Llacua*, 930 F.3d at 1179-80 (internal quotations omitted); *see Twombly*, 550 U.S. at 567 (dismissing where there was "an obvious alternative explanation"). Plaintiffs themselves identify numerous independent reasons for price increases: pandemic-related disruption and losses (Compl. ¶¶ 89-90); staffing challenges (*id*. ¶¶ 190, 232); climate-related costs and uncertainty (*id*. ¶¶ 84-88); cost pressures (*id*. ¶¶ 9, 194); capital expenditures on resort infrastructure (*id*. ¶¶ 110, 193, 198); and demand that strained capacity (*id*. ¶¶ 191-92, 232). Price increases are independently rational responses to any one of these common market forces, or to ordinary investment and inflation pressure.

*i. The contents of the information allegedly exchanged do not support an inference of agreement.*

Information exchanges are not inherently unlawful, as they can "increase economic efficiency." *U.S. Gypsum*, 438 U.S. at 441 n.16. Even sharing "sensitive non-public data such as pricing data . . . does not, without more, plausibly plead the agreement/concerted-

action element of a § 1 claim because competitors may exchange price information for legitimate business reasons." *Segal v. Amadeus IT Grp., S.A.*, 2026 WL 879583, at *4 (N.D. Ill. Mar. 31, 2026) (internal quotations omitted). And "[t]he exchange of past price data is greatly preferred" because, unlike future pricing information, it is unlikely to be used to facilitate a pricing conspiracy. *Brown v. JBS USA Food Co.*, 773 F. Supp. 3d 1193, 1222-23, 1225-26 (D. Colo. 2025) (internal quotations omitted). The Complaint is devoid of allegations that Defendants communicated about non-public pricing.

Plaintiffs' reliance on information that Resort Defendants shared with RRC and NSAA also falls short. Plaintiffs assert that this historical information *could*, under certain circumstances, be shared with other resorts. Compl. ¶¶ 116, 134. But they do not allege that RRC or NSAA *actually* shared resort-level data with any competitor. *See Segal*, 2026 WL 879583, at *2 (complaint did not plead that aggregated data was ever used to identify specific hotels). And the information that RRC and NSAA allegedly *did* share—aggregated and historical—is not the type to cause competitive concern and is therefore insufficient to infer an agreement.

*ii. Independent decisions by some Resort Defendants to retain RRC for consulting services do not support an inference of agreement.*

Plaintiffs speculate that resort-level data informed RRC's recommendations to its consulting clients (Compl. ¶¶ 6, 149, 261), but a competitor's independent decision to retain a consultant that also advises others does not suggest an agreement among the consultant's clients. "[O]btaining information from the same source does not reduce the incentive to compete"; competitors with "the same knowledge regarding the preferences of their potential customers" "remain just as motivated to compete with each other."

*Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083-84 (9th Cir. 2025) ("*Gibson III*"). Just as an attorney who "does not share one client's confidential information with another" but "gets smarter because of what she has learned from each client engagement" is not party to an agreement among all her clients, a market research firm that advises multiple clients is not party to an agreement among those clients. *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *6 (D. Nev. May 8, 2024) ("*Gibson II*"), *aff'd*, 148 F.4th 1069 (9th Cir. 2025).

Plaintiffs' consulting allegations fit squarely within that reasoning. Plaintiffs allege only that two resorts—Vail Resorts and Alterra—hired RRC for consulting. But for those resorts, Plaintiffs do not identify a single pricing recommendation from RRC, which Resort Defendant received it, when, or whether anyone followed it. Their assertions that RRC "necessarily" used other resorts' data and that clients "followed" its advice are suppositions, not facts. Compl. ¶¶ 6, 149. Nor do Plaintiffs identify any occasion on which RRC conveyed one Resort Defendant's confidential data to another, or any agreement among Resort Defendants to retain RRC or to follow its advice. To the contrary, the engagements Plaintiffs describe show that resorts hired RRC to improve their own competitive position. *Id.* ¶¶ 146-47.

Moreover, Plaintiffs never allege Boyne or Powdr were RRC consulting clients at all; indeed, during the Class Period, Boyne and Powdr were not. Plaintiffs try to sidestep that dispositive fact through group pleading. *E.g.*, Compl. ¶ 141; *see Huntsman*, 2025 WL 2405953, at *4-5. They also vaguely reference an RRC client list. Compl. ¶ 152 (alleging that RRC's client list includes "resorts owned by Powdr and Boyne"). But vague references to client lists do not establish that Boyne or Powdr were clients for RRC's

consulting services during the Class Period or that the "resorts" were among the handful of resorts Plaintiffs include in the case. *E.g.*, Compl. ¶ 31 (listing only three of Boyne's ten resorts in this case). Without well-pled allegations that two of the four Resort Defendants were RRC consulting clients, Plaintiffs cannot allege that RRC consulting agreements served as a conduit for a conspiracy among them. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905-06 (6th Cir. 2009) (affirming dismissal of Sherman Act allegations because plaintiffs "fail to aver facts sufficient to implicate [the defendants] in any conspiracy").

Nor do allegations that RRC maintains an "interactive digital database" or presented aggregate projected capital expenditures at an NSAA convention move the needle. Compl. ¶¶ 104, 138, 148, 193. They describe RRC's *own* tools and aggregate industry presentations, not that any *Resort Defendant* obtained a competitor's resort-specific (or Defendant-specific) pricing.[4]

*iii. Alterra's, Boyne's, and Powdr's alleged use of Aspenware does not support an inference of agreement.*

Competitors licensing software from the same vendor is not inherently suspect. *Gibson III*, 148 F.4th at 1084. A software-based claim requires allegations that competitors followed pricing recommendations generated from one another's non-public information. *See id.* at 1083; *Dai v. SAS Inst. Inc.*, 2025 WL 2078835, at *5 (N.D. Cal. July 18, 2025); *cf. Cornish-Adebiyi v. Caesars Ent. Inc.*, 184 F.4th 172, 185-91 (3d Cir. 2026) (claim stated

[4] In fact, anyone with an internet connection and a web browser could see the price that the Resort Defendants were charging for lift access at any point in time by looking on their websites. *E.g.* https://www.epicpass.com/passes/epic-pass.aspx. The Court can take judicial notice of the fact this information is available to the public. *ASA*, 127 F.4th at 184.

where defendants allegedly followed pricing recommendations based on competitors' information 90% of the time).

Plaintiffs' Aspenware theory fails for multiple reasons. First, Plaintiffs admit that Vail Resorts does not use Aspenware. Compl. ¶¶ 8, 178; s*ee Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *3 (D. Nev. Oct. 24, 2023) (no plausible inference of agreement where complaint did not allege that all defendants used the same pricing algorithm). Second, antitrust law does not "require businesses to decline to take advantage of a service because its competitors already use that service," particularly a tool "purpose-built" for a particular niche. *Gibson III*, 148 F.4th at 1084; Compl. ¶ 157. Third, Plaintiffs do not allege that any Resort Defendant adopted Aspenware's pricing recommendations. At most, they allege that Aspenware's standardized data categories "could be used" for "real-time dynamic pricing logic." Compl. ¶ 172.

Lastly, Plaintiffs identify no common pricing outputs, no shared pricing decisions, no competitor information passed among Resort Defendants through the tool, and no coordinated use of the tool. Plaintiffs do not plead that any Defendant used Aspenware to share non-public, competitively sensitive information with another Defendant or to match the prices of any of its competitors, or that Aspenware used non-public data from one user to make any pricing recommendations to another user. *See Gibson II*, 2024 WL 2060260, at *5 (failure to allege exchange of confidential information through the hub's software "compels the conclusion that there is no rim").

Plaintiffs do not allege that the module draws on competitors' data, that it produced common prices across resorts, that any of the Defendants used the *same* dynamic pricing

strategies, or even that Powdr or Boyne (or Vail Resorts) use Aspenware for dynamic pricing. *See Gibson III*, 148 F.4th at 1083-84. Using a configurable tool to respond to one's own demand under an independent strategy is not an agreement to charge the same price.

*iv. Market structure (concentration, barriers to entry, inelastic demand) does not support an inference of agreement.*

Plaintiffs' market-structure allegations—high barriers to entry, high concentration, and inelastic demand (Compl. ¶¶ 198-204)—are conclusory and do not address all products in their alleged bundle, such as equipment rentals or food and beverage sales.

*v. Trade association membership and conference participation do not support an inference of agreement.*

Plaintiffs allege that NSAA conventions provided "opportunities to collude," Compl. ¶¶ 189-97, 208-09, but the discussions they cite occurred primarily on public panels, were reported in trade publications, and addressed generic industry topics such as "consolidation," "capacity management," and "season pass strategy." *Id*. ¶¶ 9, 195. "[A] trade association is not by its nature a walking conspiracy." *Llacua*, 930 F.3d at 1178 (internal quotations omitted); *see In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."). Moreover, Plaintiffs cite an example of *disagreement* (the opposite of conspiracy): at the 2023 NSAA convention, Boyne's CEO allegedly advised against "oversell[ing] season passes," while a Vail Resorts executive allegedly said he would "not [] stop selling season passes[.]" Compl. ¶ 192.

**2) Plaintiffs do not allege "plus factors" sufficient to infer the existence of an agreement among Resort Defendants to share information (Count II)**

Count II fails for the same reason: no agreement. Even if each Resort Defendant separately shared information with NSAA and RRC, such parallel conduct alone does not support an inference that Resort Defendants agreed to exchange information. *Twombly*, 550 U.S. at 556-57; *Segal*, 2026 WL 879583, at *4 (sharing information is not "sufficient to plead plausibly the agreement element of [plaintiffs'] § 1 claim").

The only unique plus factor Plaintiffs allege is that sharing such information was against Resort Defendants' independent self-interests. Compl. ¶¶ 205-07. But Plaintiffs' own allegations establish that the published information was historical and aggregated, and that the reports' confidentiality terms bar the release of resort-identifying data. *Id.* ¶¶ 109-15, 123-33. Disclosing information to a market research firm on those terms is not against individual Defendants' self-interest. *See Llacua*, 930 F.3d at 1173 (association gathering and publishing "rate of pay" of members does not suggest a conspiracy); *see also In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *3 (N.D. Ill. Aug. 29, 2022) (dissemination of *aggregated* information "is generally favored in the antitrust context") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001)).

**B. Plaintiffs do not sufficiently plead that an agreement to exchange information through a vendor caused anticompetitive effects in a relevant market**

Although Plaintiffs acknowledge Count II is subject to a rule of reason analysis (Compl. ¶ 268), they offer only labels and conclusions on each element. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Under the rule of reason, Plaintiffs bear "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that

harms consumers in the relevant market," *Am. Express*, 585 U.S. at 541, and the Tenth Circuit enforces that requirement at the pleading stage, *ASA*, 127 F.4th at 183, 186-90. That burden has particular force here because "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects[.]" *U.S. Gypsum*, 438 U.S. at 441 n.16.

Even if Plaintiffs had alleged an agreement to share competitively sensitive information—they have not—Count II fails because the Complaint does not plausibly allege a relevant market, let alone that the purported information exchange caused anticompetitive effects in that market.[5]

**1) Plaintiffs fail to adequately plead a relevant product market in which an anticompetitive effect occurred**

A relevant market has two parts—a product market and a geographic market—and each must capture the real-world substitutes consumers treat as alternatives. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324-25, 336-39 (1962). Plaintiffs do not attempt to substantiate the contours of their alleged geographic market[6]—the United States

[5] Plaintiffs cannot avoid these requirements through their alternative invocation of "quick look" review. Compl. ¶ 271. Abbreviated analysis is reserved for restraints whose anticompetitive effects would be obvious to "an observer with even a rudimentary understanding of economics." *FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)); *see Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998). Because information exchanges are not inherently anticompetitive, *see Gypsum*, 438 U.S. at 441 n.16, they are the paradigm of conduct that does not qualify for quick look review. *See Todd*, 275 F.3d at 206-07.

[6] Plaintiffs fail to allege, for example, why resorts in Canada are not included in their alleged market despite repeated references to resorts in "North America." *E.g.* Compl. ¶¶ 43, 64, 76, 129, 198. Plaintiffs' failure to define a geographic market is a separate basis for dismissal. *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 2023 WL 7277313, at *5-6 (D. Colo. Sept. 29, 2023), *aff'd*, 127 F.4th 178 (10th

(Compl. ¶¶ 78-83, 268)—and Plaintiffs fail to adequately define their alleged product market.

**First**, the Complaint "does not provide sufficient clarity" to "discern what is included [in the alleged product market] and what is not." *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *8 (N.D. Cal. Nov. 30, 2021), *aff'd,* 85 F.4th 948, 956 (9th Cir. 2023). Plaintiffs variously describe a "Destination Ski ***Resort*** market" of resorts themselves (*e.g.*, Compl. ¶¶ 1, 3, 78) (emphasis added), a "Destination Ski ***Packages***" market of "multi-mountain season passes, daily lift tickets, equipment rentals, lessons, ***and ancillary goods and services***," *id.* ¶¶ 2, 268 (emphases added), and a market of "***all*** ski-related or snowboard-related purchases," including "on-mountain food, beverage, and lodging." *Id.* ¶¶ 44, 50. That uncertainty requires dismissal. *Coronavirus*, 2021 WL 5936910, at *7-8.

**Second,** even crediting the "Destination Ski Packages" market (Compl. ¶ 268), Plaintiffs' claims fail. A "cluster market exists only when the 'cluster' is *itself* an object of consumer demand." *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004) (emphasis in original). "To qualify as a cluster market, the 'clustered' goods must be generally purchased as a group[.]" *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1379 (W.D. Wis. 1997). The "cluster approach" is improper where there is competition between firms that provide *individual* services in the cluster, even if they do not provide *all* the services in the cluster. *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1221-22 (10th Cir. 1986).

---

Cir. 2025) (dismissing antitrust claim where, *inter alia*, geographic market allegations were conclusory).

Plaintiffs do not plausibly allege that consumers buy the bundled products together, rather than individually. Nor do they allege, for example, that food and beverage vendors do not compete with the Resort Defendants for food and beverage sales at that individual level even though the vendors may not also provide ski lessons, or that neighboring ski stores do not compete with Resort Defendants for equipment rentals even though the stores may not also provide lodging. That omission is fatal.[7] *See Brooklyn Downtown Hotel LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO*, 2017 WL 1192179, at *6-7 (S.D.N.Y. Mar. 29, 2017) (dismissing cluster market absent allegations that participants "prefer to use full line providers").

To the contrary, the Complaint's description of a ski trip confirms that guests do not buy these products as a package: a skier "may need" parking or lodging, "[n]ovices (and some intermediates)" need lessons, and equipment may be owned or rented. Compl. ¶ 48. Guests choose between season passes and lift tickets, and Plaintiffs plead separate price trends for each component. *Id.* ¶¶ 25, 213-29. A market sweeping together nearly every expense of a ski vacation does not "correspond to the commercial realities" of the industry. *Coronavirus*, 2021 WL 5936910, at *6 (quoting *Brown Shoe*, 370 U.S. at 336).

[7] Plaintiffs' conclusory allegations about "[i]nelastic demand" and "substitutes" do not save their claimed cluster market. Compl. ¶ 201-04. The relevant question is *not* whether consumers would turn to "other winter recreational activities" but whether they would "respond to a price increase by a full line provider" "by shifting all or part of their business to partial line or single service providers"—*e.g.*, obtaining various ski-related services individually from hotels, equipment vendors, instructors, and the like. *Brooklyn*, 2017 WL 1192179, at *6-7. Nor do Plaintiffs plead any of the *Brown Shoe* factors. *See PhantomALERT Inc. v. Apple Inc.*, 183 F.4th 790, 801-03 (D.C. Cir. 2026).

**2) Plaintiffs do not plead facts showing that any information exchange caused anticompetitive effects**

Plaintiffs' information exchange allegations fail under both the direct and indirect effects test. *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310-11 (10th Cir. 2017).

Direct effects: Plaintiffs do not plead any anticompetitive effect caused by an information exchange. A plaintiff relying on increased prices must plead and prove a plausible link showing "an actual anticompetitive change in prices after the restraint was implemented." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021). Because rising prices "are fully consistent with a free, competitive market," *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012), plaintiffs must not "confuse cause and effect." *Gibson III*, 148 F.4th at 1088.

Plaintiffs allege that pass, lift-ticket, rental, and lesson prices rose during the Class Period, Compl. ¶¶ 11, 213-31, but plead no facts linking those increases to the alleged exchange of information rather than to ordinary market forces. *See Buccaneer Energy*, 846 F.3d at 1311-12. Indeed, the Kottke Report that Plaintiffs quote shows that average adult weekend ticket prices "steadily increased"—a "near doubling"—over a decade that began years before the alleged conspiracy, Compl. ¶¶ 93, 111, and ticket revenue per skier visit rose 59% over that same decade. *Id*. ¶¶ 126-27. Plaintiffs "confuse cause and effect," *Gibson III*, 148 F.4th at 1088, by pleading obvious independent explanations for rising prices: pandemic-era strain, climate pressures, an aging customer base, and flat participation. Compl. ¶¶ 4, 85-92. A price trend that predates the alleged exchange, and that the Complaint attributes to industry-wide pressures, does not plausibly show that the

exchange caused prices to rise. *See Twombly*, 550 U.S. at 567-68.

Plaintiffs' allegations of reduced quality—overcrowding, depleted rental fleets, reduced staffing, and long lift lines—fare no better. Compl. ¶ 232. They describe excess demand, not restricted output, and the Complaint itself attributes crowding to rising skier visits, the discounted Epic Pass, and a ski patrol strike. *Id.* ¶¶ 9, 90, 111, 191-92, 232. Nothing connects these conditions to the alleged exchange of survey data.

<u>Indirect effects</u>: Nor can Plaintiffs proceed indirectly because they do not plausibly allege harm to competition or that Defendants possess power in their alleged market. Plaintiffs' only market-share allegation is over-simplified: because Resort Defendants own or operate 27 of 32 "Destination Ski Resorts," they "would control at least 81% of the market" "[i]f all Destination Ski Resorts had equal skier visits and revenue." Compl. ¶ 83. That figure does not measure sales of the alleged product in this case, "Destination Ski Packages," and, even accepting Plaintiffs' market definition (which, as discussed above, is implausible), Plaintiffs plead no facts concerning shares, entry conditions, or market trends for rentals, lessons, or food and beverage. *Id.* ¶ 50. A "high" share without "particular factual allegations" supporting it does not suffice, *Bristow*, 691 F. App'x at 517, and even a high share, standing alone, is "insufficient to establish market power," *ASA*, 127 F.4th at 190 (internal quotations omitted).

**3) Plaintiffs' survey-and-benchmarking allegations do not suggest an anticompetitive effect**

Plaintiffs' first theory is that Resort Defendants shared "current, non-public business information" with RRC, which RRC then used "to prepare detailed benchmarking reports." Compl. ¶ 94. But the information Plaintiffs describe is not the kind that harms

competition. Although Plaintiffs label the data "current" (*id.* ¶¶ 5, 94), their own allegations describe end-of-season surveys, submitted months before the reports are published and compiled into a ten-year historical dataset. *Id.* ¶¶ 109, 118, 128, 136. Such retrospective data does not reveal how competitors will set prices going forward. *Cf. Brown*, 773 F. Supp. 3d at 1222-23, 1225-26.

The reports are also aggregated, publishing national, regional, and size-based averages under terms promising that resort-level data will be used only as part of an aggregated data set. Compl. ¶¶ 111, 114, 124, 132. That is *not* disaggregated information that "identif[ies] particular parties, transactions, and prices" and is therefore "seen [by courts] as potentially anticompetitive because [it] may be used to police a secret or tacit conspiracy to stabilize prices." *Todd*, 275 F.3d at 212; *see also Segal*, 2026 WL 879583, at *5. And "[p]ublic dissemination is a primary way for data exchange to realize its procompetitive potential." *Todd*, 275 F.3d at 213; *see Brown*, 773 F. Supp. 3d at 1206. Here, pricing for lift access, lessons, and rentals is publicly available online,[8] and Vail Resorts reports the same underlying revenue in its SEC filings. Compl. ¶ 129. A historical cut of already-public figures is not the kind of secret, forward-looking pricing data whose exchange raises competitive concern.

This case is thus unlike *Brown v. JBS USA Food Co.*, where the alleged hub facilitated "the exchange of recent and current competitively sensitive information" *that was not otherwise publicly available*, and did not anonymize it, so competitors could

---

[8] *E.g.*, https://www.vail.com/plan-your-trip/lift-access/tickets.aspx (lift tickets); https://www.vail.com/plan-your-trip/ski-and-ride-lessons/category/adult.aspx (lessons).

readily "identify each other's data." 773 F. Supp. 3d at 1222-23, 1225-26. Plaintiffs here plead no equivalent facts. The reports Plaintiffs describe publish averages by region and ski-area size under terms promising aggregated use, and the Complaint identifies no instance in which any Resort Defendant received or identified a competitor's resort-level data.[9]

**4) Plaintiffs plead only hypotheticals, not actual facts, in support of an information exchange through RRC and NSAA**

Plaintiffs' second theory is that RRC served as a conduit for horizontal exchange. They assert "RRC and NSAA ***could*** ***share with*** ***one*** ***Resort Defendant the*** ***resort-level data*** ***of*** ***another*** ***Resort Defendant without restriction***." Compl. ¶ 116 (emphasis in original). Plaintiffs are silent about actions taken by NSAA, and they allege that RRC drew on its database in providing consulting services, which, as explained above, does not suggest an agreement. *See supra* A.1.b.ii.

These allegations describe what Defendants *could* have done, not what they *did*. Plaintiffs plead no facts showing that RRC ever shared one Resort Defendant's resort-level data with another—and the very confidentiality terms they quote promise that such data will be used only as "part of [a] broader, aggregated data set" and that identifying data "will not be released." Compl. ¶¶ 114-15, 132-33. Those provisions cut against, not in favor of, any inference that such data was shared. The Tenth Circuit has squarely rejected liability premised on what a shared intermediary makes possible: "what matters

[9] Not only is current pricing information about lift access, equipment rentals, and lessons available for the world to see, but the Kottke Report is also available to anyone who desires to purchase it, unlike Agri Stats reports, which were not available to the public. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 675 (N.D. Ill. 2023).

. . . is the scope of the agreement," and "liability based solely on facilitation fails to distinguish between agreed-upon use and unendorsed, individual abuse." *Homie*, 186 F.4th at 773. As described above, *supra* A.1.b.ii, the mere specter of a common vendor's access to confidential information—whether a market research firm like RRC or a law or accounting firm—does not plead an unlawful exchange. *See id.*; *Twombly*, 550 U.S. at 570 (claims must be "plausible," not merely "conceivable").[10]

Because Plaintiffs plead no facts showing that any horizontal exchange occurred, they necessarily plead no anticompetitive effect flowing from one, as discussed above.

**CONCLUSION**

Plaintiffs have failed to plausibly allege any "rim" agreement among competitors. Defendants respectfully ask the Court to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

[10] Plaintiffs' Aspenware allegations fail for the same reason. As discussed above, Plaintiffs plead no facts showing that Aspenware pooled one resort's data to set another's prices. Compl. ¶¶ 8, 156, 179. Plaintiffs must plead facts showing the tool was used to exchange confidential information among competitors. They have not.

Dated: October 23, 2026.

Respectfully submitted,

*/s/ R. Reeves Anderson*
R. Reeves Anderson
**Arnold & Porter Kaye Scholer LLP**
1144 Fifteenth Street
Suite 3100
Denver, CO 80202-2848
Telephone: (303) 863-1000
Reeves.Anderson@arnoldporter.com

C. Scott Lent
**Arnold & Porter Kaye Scholer LLP**
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
Scott.Lent@arnoldporter.com

Matthew Tabas
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue NW
Washington, DC 20001
Telephone: (202) 942-5000
Matthew.Tabas@arnoldporter.com

***Counsel for Defendant Vail Resorts, Inc.***

*/s/ Kathryn A. Reilly*
Kathryn A. Reilly
Michael Baker
Michael R. Krantz
Kendra Sendler Kumor
**Wheeler Trigg O'Donnell LLP**
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: 303.244.1800
Facsimile: 303.244.1879
Email: reilly@wtotrial.com
mbaker@wtotrial.com
krantz@wtotrial.com
kumor@wtotrial.com

Craig C. Martin
Matt D. Basil
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr.
Chicago, IL 60654-3406
Telephone: 312.728.9000
CMartin@willkie.com
MBasil@willkie.com

Katrina Robson
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, D.C. 20006-1238
Telephone: 202.303.1096
KRobson@willkie.com

***Attorneys for Defendant Alterra Mountain Company***

*/s/ Kevin Y. Teruya*
Kevin Y. Teruya
kevinteruya@quinnemanuel.com
Adam B. Wolfson
adamwolfson@quinnemanuel.com
Brantley I. Pepperman
brantleypepperman@quinnemanuel.com
**Quinn Emanuel Urquhart & Sullivan, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

***Attorneys for Defendant POWDR Corp.***

*/s/ Karen M. Lent*
Karen M. Lent
Boris Bershteyn
Sam Auld
Madeleine W. Gramigna
**Skadden, Arps, Slate, Meagher & Flom LLP**
One Manhattan West New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
karen.lent@skadden.com
boris.bershteyn@skadden.com
sam.auld@skadden.com
madeleine.gramigna@skadden.com

Brian A. Birenbach, Esq.
**Gfeller Laurie, LLP**
2301 Blake Street, Suite 100
Denver, CO 80205
Telephone: (970) 333-8160
Email: bbirenbach@gllawgroup.com

***Counsel for National Ski Areas Association***

*/s/ Amy E. Murphy*
Amy E. Murphy (MI P82369)
**Miller Johnson**
45 Ottawa Ave SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700
murphya@millerjohnson.com

Jeffrey A. Turner (MI P85291)
**Miller Johnson**
500 Woodward Ave., Suite 3600
Detroit, MI 48226
(313) 672-6950
turnerj@millerjohnson.com

***Attorneys for Defendant Boyne***

*/s/ Simone Stover*
Simone Stover
**STINSON LLP**
1114 Fifteenth Street, Suite 2400
Denver, CO 80202
Tel: (303) 376-8417
Email: simone.stover@stinson.com

J. Nicci Warr
Benjamin Levin
**STINSON LLP**
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Tel: (314) 863-0800
Email: nicci.warr@stinson.com
Email: ben.levin@stinson.com

***Counsel for RRC Associates, Inc.***

**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on October 23, 2026, I electronically filed the foregoing **MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ R. Reeves Anderson*
Robert Reeves Anderson